# 1

STATE OF MICHIGAN

FIFTY-FIFTH CIRCUIT COURT-FAMILY DIVISION (CLARE COUNTY)

In the matter of

CRYSTLE DAVIS                                    File No. 17-069-NA

_____/

DISPOSITIONAL HEARING

BEFORE THE HONORABLE MARCY A. KLAUS, FAMILY COURT JUDGE

Harrison, Michigan – Tuesday, March 20, 2018

APPEARANCES:

| | |
|---|---|
| For the Petitioner: | MS. EILISIA SCHWARZ (P66350)<br>Chief Assistant Prosecuting Attorney<br>225 West Main Street<br>Harrison, Michigan 48625<br>989-539-9831 |
| Guardian Ad Litem: | MS. ANNETTE HOWE (P67491)<br>Post Office Box 3<br>Beaverton, Michigan 48612<br>989-429-7218 |
| For Respondent Father: | MR. RAVI GURUMURTHY (P78368)<br>2604 Sunnyside Drive<br>Post Office Box 1014<br>Cadillac, Michigan 49601<br>231-577-4822 |

Recorded by Stacy Swan CEO – 8859
Transcribed by Josette Given – CER 5277
989-539-7109

1

1

## TABLE OF CONTENTS

2

3  <u>WITNESSES: PETITIONER</u>                                                    <u>PAGE</u>
   NONE

4

5

6  <u>WITNESSES: GUARDIAN AD LITEM</u>
   NONE

7

8

9  <u>WITNESSES: RESPONDENT MOTHER</u>
   NONE

10

11

12

13  <u>WITNESSES: RESPONDENT FATHER</u>
    NONE

14

15

16

17  <u>EXHIBITS</u>                                      <u>INTRODUCED</u>    <u>ADMITTED</u>
    NONE

18

19

20

21

22

23

24

25

2

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

1  Harrison, Michigan.

2  Thursday, February 22, 2018 — 9:08 a.m.

3  BAILIFF:  All rise.  Probate and Family Court for

4  the County of Clare is now in session, the Honorable Judge

5  Marcy A. Klaus presiding.

6  THE COURT:  Thank you.  Have a seat please.

7  Calling the case of in the matter of Crystle Davis.  And this

8  is file 17069NA.  Would counsel identify please?

9  *THE COURT* MS. SCHWARZ:  Thank you, your Honor.  Chief

10  Assistant Prosecuting Attorney, Eilisia Schwarz appearing on

11  behalf of the petitioner.  *ENTERPRISE*

12  THE COURT:  Thank you.

13  MS. HOWE:  Good morning, your Honor.  Annette Howe,

14  Guardian Ad Litem for Crystle Davis.  *WAIVE TIRED*

15  THE COURT:  Thank you.  *THE COURT*

16  MS. TOMCZYK:  Karyn Tomczyk, attorney for

17  respondent mother, who is present and seated to my left.

18  THE COURT:  Thank you.

19  MR. GURUMURTHY:  Good morning.  Thank you, your

20  Honor.  Ravi Gurumurthy on behalf of Rodney Davis.  He's here

21  in the courtroom and seated to my left.

22  THE COURT:  Thank you.  And I'll have the parents

23  state their name starting with the father.

24  MR. DAVIS:  Oh, if you don't mind — Rodney Davis,

25  but my phone's in my coat and I'm not sure it's off.

3

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

THE COURT:  Go ahead and get up and make sure it's

off   Thank you, Mr. Davis.  And I'll have the mother state

her name please?

MS. DAVIS:  Gayle Wendy Davis.

THE COURT:  All right.  Thank you.  And so, the

attorneys know, we're gonna break today for lunch at 11:20 if

you end up going that long.  So, I'll be keeping an eye on

the clock, but I wanted to kind of lay out that road map for

everybody.  I would anticipate we'll come back probably close

to one o'clock.  So, I'll let you know once we get to that

point for our lunch break today.  And then we have some

motions on behalf of the respondent father?  I'll let Mr.

Davis have a seat.  Mr. Davis is it turned off?

MR. DAVIS:  Yes.

THE COURT:  All right.  Thank you.  And so, Mr.

Gurumurthy?

MR. GURUMURTHY:  Thank you, your Honor.  I had a

couple of motions filed this morning.  One was, well I'll

start with the most recent one.  It was to strike the

Department of Health and Human Services proposed witness

list.  I didn't receive one.  It wasn't filed in time.  Some

of the witnesses in here, I have no idea who they are and

what they would testify to.  I never had an opportunity to

contact them or call them.  Some of them are the more obvious

ones.  So, I don't know which ones are gonna be called.  But

4

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

1    there was a scheduling order. The Court was very clear about

2    the scheduling order and calls for sanctions if they weren't

3    followed.  So, I don't think they were filed in ? -- in an

4    appropriate time frame.  In fact, I received this as of

5    Sunday. There's no proof of service saying they sent anything

6    prior to that.  So, I would simply ask that they identify who

7    the witnesses are. Some witnesses are the obvious ones.  If

8    those are the ones that are being called, I don't have an

9    objection, but there are others that would be testifying --

10            THE COURT:  On what date did you receive the

11   petitioner's witness and exhibit list?

12            MR. GURUMURTHY:  I received this on Sunday the 18th.

13            THE COURT:  And just -- of February, just to be

14   clear.

15            MR. GURUMURTHY:  Correct. February. Yes.

16            THE COURT:  And have you discussed the witness list

17   in your motion with the petitioner at all?

18            MS. SCHWARZ:  No.

19            THE COURT:  Did you have that opportunity? All

20   right.  So, Ms. Schwarz?

21            MS. SCHWARZ:  Actually, we sent this witness list

22   out prior to, just a second, we sent this witness list out on

23   January 2nd, 2018.  And we provided a proof of service to the

24   court that was dated January 2nd, 2018, that it was served on

25   all parties, including respondent father, back in January.

5

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

1   We confirmed that that in fact was done over the weekend and

2   as a courtesy, we resent the witness and exhibit list to

3   respondent father again when they couldn't find their copy.

4   So, they've gotten it twice. Once in January, then the trial

5   was adjourned. The witness list hasn't changed.

6           THE COURT: Do you have an agreement with the

7   attorneys of record for service by email?

8           MS. SCHWARZ: Yes. That's a consistent pattern of

9   how we process things.

10          THE COURT: Is it a written agreement?

11          MS. SCHWARZ: It is not a written agreement,

12  however that's the way all of, like, I was served the motions

13  that came to me that way. That's just the standard practice

14  as to how we deal with court appointed attorneys.

15          THE COURT: All right. Anything else that needs to

16  be known by the Court regarding the motion regarding the

17  witness and exhibit list?

18          MS. SCHWARZ: Other than -- other than we -- we

19  filed it with the court back in January and I believe that

20  the court has that as well as the proof of service.

21          THE COURT: Who do you intend to call off the

22  witness list?

23          MS. SCHWARZ: I have Doctor Barnes, who did the

24  evaluations or the evaluation of Crystle, which led to the

25  motion that was filed by respondent father for an independent

6

*[Handwritten annotation top: TIME TO CONFUSE]*

1    evaluation on which is to be heard today. So, that's not a

2    surprise witness. Ruth Nordman is — is actually not going

3    to be available today, she had some sort of medical

4    emergency. But Ruth Nordman was the individual that

5    respondent father left his children with, so he's known her

6    for a long time. Wendy Davis is his ex-wife. Karla Keipert,

7    she's the RN that Mr. Davis spoke to at the hospital. Bianca

8    Hernandez and Jereme Bear both of those individuals have been

9    consistent throughout this case as the workers that Mr. --

10   respondent father, Mr. Davis has been dealing with so they're

11   not a surprise or not known to them. And then Katie Most,

12   just one second, I want to get where she works just a second

13

14       THE COURT: It says CMH on the witness list.

15       MS. SCHWARZ: Yep. I didn't know whether -- I have

16   another one. Community Mental Health. And that is another

17   known person throughout this case to Mr. Davis, so.

18       THE COURT: Those witnesses who you haven't named

19   just now are not being called, is that --?

20       MS. SCHWARZ: They're not.

21       THE COURT: All right. So, Mr. Gurumurthy,

22   response?

23       MR. GURUMURTHY: Yes. Thank you, your Honor. Some

24   of the witnesses -- well, first I'll address the service via

25   email. I will stipulate to that -- that amongst us

*[Handwritten left-margin annotations: RUTH WAS AT THE COURT ON THIS DAY; CONSIST WITH LIEING PURGRY; THIS IS NOT COURT LANGUR; LIE NOT; HOW MANY. Interlinear: LIE NOT A; ENTERPRISE; I NEVER SEEN OR HRD OF HER; BING CALLED; OUT TAKE; IS THIS THE JUDGE; JUMPX 3]*

7

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

*NOT PROPER RULE OF THUMB. IS A CORPRAL PUNIS METHED OF ABUCE*

1  attorney's it is a rule of thumb, a more verbal understanding

2  that sometimes emails do serve as long as the proof of

3  service states, either it was served personally, via email,

4  and/or by first class mail. So, I will acknowledge that I

5  did receive the witness list but not till the 18th of

6  February. It might have been dated, it's unsigned, but it

7  might have been dated January 2nd or whatever the January date

8  is. But it still does not comport with what the pre-trial

9  scheduling order says. Expert witnesses have to be exchanged

10  prior to December 27th. Even if it was January, it was after

11  the fact. And any other witnesses by the petitioner would be

12  the 27th. The burden is not on me to produce or do anything

13  in this matter. It is on the Department. *JER DARE*

14      So, the rules have to be followed. Court rules call

15  for that and court rules are very clear, if a pre-trial

16  scheduling order is not followed then there's some sanctions.

17  Court has the authority and must follow and enforce those

18  sanctions at that point. As I go through some of these

19  witnesses and as Ms. Schwarz indicated who they are, the

20  majority of them deal with Misty. I think Misty was out and

21  removed from this petition when this first started. So, it

22  has -- it has no relevance to Crystle's matter.

23      So, again, I'm at a loss then as to -- as to why

24  the nurse practitioner who spoke to my client, when it

25  related to Misty's alleged seizure incidents would be that

*AFTER CRY E-UAL*

*JER DARE*

*ON THE PHONE*

*KANGA JUMP*

*NOT*

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

*[handwritten: NOT]*

1    relevant to Crystle's allegations in the petition?

2                THE COURT:    And that may be addressed by one of

3    your next motions as well, correct?

4                MR. GURUMURTHY:    Correct. And then my follow up

5    motion with that would be getting a separate evaluation for

6    Crystle.  Doctor Barnes has done one.  My client has

*[handwritten: SUPORTS THE LIE]*

7    insurance and has agreed to have a second one done so it

8    would be at his costs.  And -- and I think that calls for

9    experts at that point under 702 to then present scientific

10   evidence, and that's what this is.  So, I would simply ask

11   that Doctor Barnes's testimony, and again, Doctor Barnes's

12   report only alludes to what Crystle has provided, not with

13   any input from the father.  He has raised this child for over

14   ten years by himself.  There's no other input in there.  But

*[handwritten: ENTER PRISE]*

15   this is how experts go.  And this is how -- it's a battle of

16   the experts.  I don't have an expert because the Department

*[handwritten: ENTERA PRISE] [handwritten: BARE]*

17   has refused to then produce Crystle for another evaluation.

18   They've said, we don't think she needs one.  It's not for them

19   to decide whether she needs one or not.  He's the parent.

20   His parental rights are not terminated.  He has the right to

21   request one.  He has the right to get one. He hasn't had that

22   opportunity.  So again, Doctor Barnes testifying could sway

*[handwritten: DEMAND]*

23   this court with his expert opinion one way or the other.

24   There is no rebuttal to that expert opinion and he has a

25   right to have his own expert then rebut that opinion. And

*[handwritten: PROTECT THAT ENTER PRISE JUDGE]*

*[handwritten: ALWAYS JUST ONE WAY/NO OTHER]*

9

1   that's all it is, it's expert opinion.  So, I can take what

2   the -- what the report states for its face value, but I don't

3   think that Doctor Barnes is then able to then testify if I

4   can't ever rebut that testimony.  Which I can't do today.

5            THE COURT:  All right.  Moving on to that motion

6   then.

7            MS. SCHWARZ:  Your Honor, if I -- if I may just to

8   make sure that the record is clear, because there's already

9   been threats of appeals and being, you know, reported to the

10  Bar, or all of the parties, and all of the parties being

11  sued.  I would ask that you indulge me to make sure that this

12  record is clear.  And by the way, those threats have come

13  from respondent father to the parties in the case.

14            I would like to note and direct the courts

15  attention to the pre-trial scheduling order.  And that was

16  dated December 13th, 2017 signed by yourself, indicating that

17  the parties shall exchange and file with the court the names

18  and addresses of all witnesses to be called at trial or a

19  hearing by January 10th, 2018.  That expert witnesses be

20  disclosed by that same date.  So, I wanted to make sure

21  because respondent father's attorney referenced a different

22  pre-trial order.  This is the amended pre-trial order. So, as

23  far as my response and my rebuttal in that motion to strike,

24  I think that not all -- not all of the facts are presented in

25  the argument.

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

THE COURT: All right. As to the independent psychological evaluation of Crystle Davis that's being requested by the father, your response to that motion?

*DEMAND*

MS. SCHWARZ: In response to that, just one moment, your Honor. That motion was delivered to us and that request was delivered to us on February 8th to seek an independent evaluation. It's our opinion that should respondent father need to have an independent evaluation, that could have been done long before today's date. We -- if -- if he needs and needs to have the court pay for it that would be something just like he did previously. His need for the appointment of a private investigator and that the court pay for it. That motion came in at the last minute in this particular case, January 11th. This case has been going on for a long period of time and if he needed to investigate anything, he could have done that when the initial petition was filed.

We were already scheduled for a trial in this particular case the beginning of this year. It was adjourned at the request of the respondent father. So, I -- I certainly believe that, you know, if the court finds that he's entitled to have that independent evaluation and that the court pay for it or whatever the difference is that his insurance doesn't cover. Because he indicates to us that he's basically indigent. And we've provided the evaluation with a commonly used expert in this court to provide an

Handwritten margin notes: ROD SET THIS FOR JAN 16 18 '82; IT WAS NEVER; RIGHTS DENIED; AFFORD IT; THIS IS A LIE; STUDERS WHEN LIEIA; NOT; DOES↗; NEVER ASK TO PAY FOR IT; YES IT DOSE ALWAYS ALREADY; ENTERPRISE BARNS SYK EVAL IS NOT A OPINION NOT LAW

11

Josette Given
Certified Electronic Recorder
55ᵗʰ Judicial Circuit Court - Family Division
17ᵗʰ Judicial District Probate Court
Harrison, Michigan

1  opinion as it relates to Crystle.

2  As it relates to Crystle and then the motion to

3  strike allegations as it relates to Misty.  The conduct of a

4  parent towards one child is indicative of how they will treat

5  another child. Misty Davis was in fact on this petition

6  initially because the allegations relating to Misty's care

7  were of grave concern to us when she needed to get medical

8  treatment and he refused to do so. That's an allegation in

9  the petition of medical neglect.  And it's -- and it's likely

10 that if we use that doctor in the anticipatory neglect or how

11 a parent treats one child is indicative of the response to

12 treatment of another child. I think that that's very relevant

13 information for the court to consider.  She's eighteen years

14 of age now but we have Crystle who is still under age and

15 subject to the need for medical treatment and we -- we

16 believe that that's very relevant for the court's

17 consideration as it relates to jurisdiction in this case.

18 THE COURT:  Back to the motion for the independent

19 psychological evaluation -- it's been indicated to the court

20 that the father's asked for Crystle to be produced, for lack

21 of a better word --

22 MR. GURUMURTHY:  Correct.

23 THE COURT: -- to the father for that independent

24 psychological evaluation.  How many times and when was that

25 request made by the father to the Department?

12

*[handwritten: CRYSTLES / OUT TAKE]*

1    MR. GURUMURTHY: It's been in -- I think, I

2    received the psychological evaluation sometime in December.

3    So, after my client and I discussed it and when he received

4    it, but I remember I was on vacation during the Christmas

5    break so it had to have been sometime in January. He has --

6    he doesn't need to ask for permission to take his daughter to

7    get a psychological evaluation. The problem is the child is

8    removed from his care. So, the proper way to do it is to not

9    just show up at the foster family's home and pick up his

10   child and leave. That would open another can of worms, so

     *[handwritten: AREST]*

11   we've talked about he has every right to do that, if that's

12   what he wants to do. There are certain orders that he has to

13   follow.     *[handwritten: RAVI]*

14           Then we had the issue of the parenting time and

15   that was in person suspended, so that put more pressure on

16   him. So, he had to go over the phone. He has talked to, I

17   believe Mr. Bear since I've talked to Mr. Bear. I've *[handwritten: RAVI]*

18   indicated we were asking for another evaluation. We'd like

19   to get it to Ronan and Associates down in Mt. Pleasant. And

20   I'll (inaudible word) motion it up. So then, here we are

21   right before trial, it's on a motion and that's -- that's all

22   he can do.

     *[handwritten: THIS WAS NOT I]*

23   *[handwritten: JUDGE]* THE COURT: All right. Thank you. Ms. Schwarz. *[handwritten: RAVI]*

24           MS. SCHWARZ: And the -- and the response to that

25   your Honor, we've received no communication from the

*[handwritten: → BARE HAS ALL CONTROL OVER EVERYTHING LIKE GOT]*

13

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

*10 X   20 X   EVERY X*

1  respondent and/or his attorney. There has been mention that

2  they may like to do that evaluation, but no formal request

3  has been made. And I will, as an officer of this court

4  indicate that Mr. Gurumurthy indicated that they would be

*COULD NOT*  5  possibly considering doing an independent evaluation, but I

*GET THIS*  6  heard nothing else, other -- other than that. There was no  *WAS*

*TILL BARE*  7  date and time given to us of the date of the evaluation, so  *TO*

*BROUGHT CRY*  8  we could make the child available or get the child to the

*LIRES*  9  evaluation. I know personally, as an officer of this court

*BARE*  10  that was not delivered to me as the attorney for Department

*KNEW*  11  of Health and Human Services. I've spoken with Bianca, who  *BY BARE*

*HE*  12  is the primary worker on this case, because we're pre-

*KNEW*  13  adjudication, she has indicated to me that she has not  *NOT BARE IS HE GAVE FUEL CADRS*

*REFUSED*  14  received any date and time request to produce the child and  *FOR THIS*

*HE*  15  our failure to comply with that. I think that this is a

*KNEW*  16  delay tactic. We were threatened with the FBI to investigate

*IT IS A*  17  for lying in this case. It is -- it is what it is. We

*RIGHT*  18  haven't had a record. The first formal request we had was

*HERMAN*  19  the motion that was set for today, the day of trial. So.

*DID*  *THE JUDGE DELAY IT*  20  THE COURT: All right. Thank you. Mr. Gurumurthy,

*PURGERY*  21  your motion to strike as well, let me make sure I'm hitting

*ON*  22  all of your motions here and I'm getting all of them. I

*STAND*  23  think it was touched on by the petitioner or was it the

24  motion in limine that was touched on? *PURGERY STOPED*

25  MR. GURUMURTHY: Right. I haven't had a chance to

*CONFUSED EVERYBODY + JUDGE CERTINLY ROD*

14

1   respond to the motion in limine Judge, but I could.

2           THE COURT:  Right.  And I want to make sure that

3   you have that opportunity. I didn't want to skip over

4   anything. So --.  *SHE DIDN'T SKIP SHE JUMP LIKE A KANGROO*

5           MR. GURUMURTHY:  And I am briefly going through my

6   email where --

7           THE COURT:  All right.

8           MR. GURUMURTHY:  -- if I could see if that request

9   was made.  Your Honor, first of all my client did make

10  threats and he has made those threats, (but) in his defense,

11  he's frustrated with how the Department has dealt with him.

12  That is the reason why he's made -- he's made threats to me    *LIE PURSERY*

13  because I haven't been able to do anything. So again, I don't

14  think --    *ENTER PRISE GREVINCE*

15          MR. DAVIS:  I thought they were my rights.    *90 REPOR*

16          MR. GURUMURTHY:  -- and -- and his threats have

17  been more about these are my rights, this is what I want done

18  and I can't get anywhere with it.  Part of the reason is he's

19  had -- so to address Misty. When Ms. Schwarz indicates that

20  neglect, medical neglect with one child would be medical

21  neglect to another.  There is no pattern to that.  It's a

22  one-time incident.  This child was seventeen at the time.

23  He's raised both his girls as a single parent for all these

24  years. The mother's missing for ten years.  No prior neglect

25  of any medical or otherwise has ever come up.  It comes up

*WHEN BARE GETS IN VALUED*

15

MISTY WAS DRUNK, PAST OUT
AT ASHLY HOLTHOME DRUGS

1   the one time, again, those could be argued and they're severe

2   allegations.  Misty's not deceased.  She was not put into a

3   terrible medical condition because of his neglect.  In fact,

4   he was there at the hospital. And again, he questioned the

5   nurses and the doctors as to what his rights were and what

6   was wrong with his child.  Simply saying that he just

7   neglected, is not true.  Because he did go to the doctors.

8   He went with the nurses.  That's why they have a nurse

9   practitioner here to testify.  He was there.  / / /

10       So, to simply say that he has been neglecting his

11  kids medical, is a pattern, that's not true.  It's a one-time

12  incident that could be clarified.  And whatever that incident

13  is, but Misty's not part of the petition.  Anything -- any

14  allegations as it relates to Misty cannot be simply comported

15  and say well, if it happened to Misty, it had to have

16  happened to Crystle. That's where this is going.  That's not

17  true.  If that was the case, all of our NA cases here would

18  have that implication. Oh, the parents are bonded with one

19  child but not the other.  Or you could use (inaudible words.)

20  because they're bonded with one, there has to be a bond with

21  the other.  I can think of numerous cases that I'm on that --

22  that -- that would play, but we know when we look at the

23  reports and the underlying facts that's not true.  We have

24  parents who are out of their kids lives for 10 years because

25  they didn't know they had a child that was born out of

16

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

1   wedlock or that was their child.  But to simply say that they

2   had a relationship with one sibling and didn't know there was

3   another sibling and now they don't have a relationship.  But

4   to then tie that into saying, well, there's a bond with the

5   older child, so there's got to be a bond with the other one.

6   It doesn't work that way.

7            So, I think that is absolutely absurd to then

8   simply state here's where it is, neglect to on -- neglect to

9   the other.  Medical records could be pulled, could be looked

10  at to see, Crystle's thirteen years of history.  She's in

11  school.  She's got her -- she up-to-date with shots.  She's

        ↑ OUT TAKE

12  been to the hospital.  So, there is no medical neglect.  So, I

13  don't think you can just state the medical neglect of one

14  child, one allegation, and simply say that applies to

15  Crystle.  That's absolutely -- you can't go down that rabbit

        OUT TAKE

16  hole.  It doesn't work.  There are rules.  The rules of

17  evidence don't allow that.  There has to be -- if there's a

18  pattern and that's where we're going then the pattern has to

19  be established.  I don't see anything in any of these

20  documents where this pattern was established.

21            Second, with -- with him getting his child for a

22  psychological evaluation, he has every right to do that.  I

    ROWAN

23  don't think he needs permission.  I could have told my client,

24  go show up, pick your child up at the foster home.  I could

25  have very well given him that advice, nobody could have done

PURGERY!

THEY CALL
IT (NOT
TRUE)

17

BARE WOULD
HAVE ME ARESSTED
HE HAS THIS WAY
OF LIEIIIG
PURGERY

STATE LAW

BARE

1  anything but for the parenting time, in person, was suspended

2  as a court order and we have to follow that order. But his

3  rights are not terminated. His -- he has every right to get

4  his child to get an independent evaluation if that's what he

5  deems is necessary in this case. But again, that never

6  occurred. He's asked Mr. Bear, I think about five times.

7  He's made appointments, he's indicated to Mr. Bear, I have

8  appointments set up, produce Crystle, do the right thing.

9  Never.

BARE

10  So, here's -- here's where we are now right before

11  trial in the end. These are motions that have to be heard

12  prior to trial for the court to then determine whether or not

13  we can move forward with this or where this matter is going.

14  You know, in talking to my client, he has indicated he has no

15  problems making admissions, but he will only admit to what

PURGERY

17  was wrong. But he hasn't done anything wrong as a single

    parent with limited income with what he can provide to his

18  kids. He's -- he's been treated by the Department, based on

19  his poverty that just because you don't have enough money to

20  do all this, you have to make admissions, get the

21  jurisdiction of the court and then services will be ordered.

22  He's asked Mr. Bear numerous times, I would love to be in

23  counseling with daughter. I'd love to have family counseling

24  but a counselor that I want to go to not one you want me to

25  go to. That's where the breakdown is. He has those rights.

BARN3
MEDS

STATE
LAW

NOT IN
A CREDIT ENTERPRISE    ENTERPRISE

STATE
LAW

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

1    To simply put down what -- what the Department feels is right

2    and use that contracted services that they have and say look,

3    this is where you're going to go, is -- is uncalled for, at

4    least that's my client's position.  I would be -- he can pick

5    his own -- own place to go to.

6           So again, if -- and again, going back to motion in

7    limine, the testimony today, if we're here for Crystle's

8    matter, that's what the adjudication is, not on Misty.

9    Anything with Misty should not be part of this record.  And

10   if Ms. Hernandez can testify as to allegations that were made

11   between Mr. Davis and his daughter Crystle Davis, we can go

12   forward with Ms. Hernandez's testimony.  But I -- I haven't

13   seen anything in the allegations that Ms. Hernandez can

14   testify to as it relates to Crystle.

15          THE COURT:  And -- and I'm gonna stop you there.

16   Thank you, Mr. Gurumurthy.

17          MR. GURUMURTHY:  Thank you.

18          THE COURT:  And, anything further Ms. Schwarz?

19   Because I -- I think I know what I'm going to do as to all

20   three of the motions.  And then we'll take a short break

21   because my decisions on the motions may help determine how we

22   move forward today as well, okay?

23          MS. SCHWARZ:  Okay.

24          THE COURT:  So, I don't mean to leave you out Ms.

25   Howe.  Do you wish to add anything in regards to the motions

19

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

1    or are you satisfied with -- with what was placed on the

2    record by the other attorney's? *PURGETORY*

3    *NEW ENTERPRISE*  MS. HOWE:  I'm satisfied with what's placed on the

4    record.  However, I would like to add regarding the service

5    received from the Department.  We were not given a choice to

6    receive them electronically for the proof of service.  We

7    were told that's how we're going to receive them, and nothing

8    was signed.  *OF FORCE*

9                 THE COURT:  All right.  Thank you.  Anything Ms.

10   Tomczyk?

11                MS. TOMCZYK:  We take no position, your Honor.

12                THE COURT:  All right.  Thank you.  So, let's go

13   *ON DAY*  through each one of these motions in turn here.

14   *OF TRIAL*  →   So, I'm going to go through them in the order that

15   I have them in my files.  So, I apologize.  Regarding the

16   respondent's -- respondent father's motion in limine, the

17   Court has reviewed the motion that was filed and taking into

18   consideration the arguments presented by Mr. Gurumurthy and

19   the response by Ms. Schwarz.  I appreciate both of the

20   attorney's for both the presentation of the motion as well as

21   the response.  I think both were well thought out.  And I

22   appreciate that very much.  But as to the motion in limine,

23   the Court would strike testimony regarding Misty Davis.  The

24   anticipatory neglect doctrine is well established, and the

25   Court certainly could hear argument regarding anticipatory

*JUDGE → SHE IS OBVIOUSLY NOT AWAKE*

20

*NOT AWAKE*

1   neglect, that's hard for me to say at this time in the
2   morning, I certainly could hear that and would under
3   different circumstances. Only because Misty was stricken
4   from the petition and the Court is persuaded by Mr.
5   Gurumuruthy's -- his presentation of the motion that there
6   was not a pattern of medical neglect as to Misty. Misty was
7   moved back into the home, resides with the father. So, I'm --

*ROD*

8   I'm only looking very narrowly at the circumstances in this
9   case. So, I'm saying that, so the attorneys know that this
10  would not necessarily apply to other cases that would be
11  presented to the court. But in this particular case, I would
12  not hear testimony regarding Misty Davis as to medical care
13  and possible medical neglect. I make no decision regarding
14  whether there was or was not medical neglect as to Misty.
15  So, is that clear to everyone? *NO*
16      MS. SCHWARZ: I guess maybe, just a point of
17  clarification. So, we can't talk about Misty at all today if
18  we go forward? *SHE EVEN CONFUSED*
19      THE COURT: You can talk about Misty but not as to
20  medical neglect.
21      MS. SCHWARZ: Okay. *ENTERPRISE*
22 *JUDGE*  THE COURT: Not -- not in that very narrow area.
23      MS. SCHWARZ: Okay.
24 *JUD*  THE COURT: So, turning to the respondent father's
25  motion to seek independent psychological evaluation and seek

*PROTECT THE ENTERPRISE*

*FOR CRY*

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

*[handwritten annotations: STATE LAW, DHS, IT WOULD BE BAD 10X, IS THIS THE JUDGE OR RAUI, BARE]*

1   a second opinion of psychological evaluation. The Court is
2   going to deny that request as untimely. And the Court finds
3   that having that rebuttal testimony would not be helpful to
4   the Court as to the adjudication trial. And the Court would
5   rely on Doctor Ronan's assessment of the father and Doctor
6   Barnes's assessment of the child.
7           Turning lastly to the respondent father's motion to
8   strike the Department of Health and Human Services proposed
9   witness list. This troubles me that everything's being done
10  by email and there's no written agreement because the court
11  rules, I believe, specify that if you're gonna do this
12  electronically, you have to have a written agreement as
13  between all the parties, that you're all agreeing to receive
14  this stuff by email because it gets lost. It gets lost very,
15  very easily. So, I am not on board with this idea of being
16  paperless in these types of cases. It's too dangerous. And
17  so, if the parties are going to continue with emailing and
18  using electronic communication, you better have a written
19  agreement and it better be in my file. That way everybody's
20  on board. We all know exactly what you're doing, and I know
21  what to expect as well.
22          Now all of that being said, there is a proof of
23  service in the Court's file. The Court reviewed the last pre-
24  trial order, I think that was a December pre-trial order,
25  I'll look back, December 13th, 2017 that allowed for exchange

*[handwritten: HIDEN, HIDUNS EVIDENCE, PURGERY]*

22

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

*JURY* ✓

1  of witnesses and exhibits for the father's bench trial to be

2  done by January 10th, 2018. So, frankly I believe both Mr.

*EMAIL* →

3  Gurumurthy and Ms. Schwarz. I think it was emailed out and I

4  don't think Mr. Gurumurthy got it till just a couple days

5  ago. And that's the danger of using email. Things get lost

*HIDE* ←

6  far too easily rather than a physical piece of paper. *ON PAPER*

7  So, I'm going to allow the witnesses as named by

8  Ms. Schwarz to be presented to the Court to allow that

9  testimony. And I think they'll be helpful to the Court. They

*ENTER PRISE*

10  are witnesses who have -- who the Court's familiar with

11  solely through the pleadings and through testimony in this

12  case up to this point. So, I think that there is good cause

13  shown to allow those witnesses to testify and so I would

14  allow for that. Okay? *NO AGIN COURT GET EVERYTHING*

15  Any other requests for relief, let me put my

16  glasses on here, specifically as to the motion in limine,

17  would be denied. I think I may have missed a couple finer

*WE GET NOTHING*

18  points. There's a request regarding possible statements of

19  the child to be made. And a concern about hearsay, and the

20  Court would simply address that as it comes up in testimony.

21  I simply don't have enough information to make that

22  determination. Since the rules of evidence would apply

23  during adjudication, then statements of the child would be

24  excluded as hearsay.

25  So, we'll take a short, about a five-minute break.

*HOW CAN YOU TAKE A BRAKE IN 5 MIN*

23

*ROD NEVER COULD CONNECT WITH RAVI*

1   So, if anyone needs to use the restroom or get a drink of
2   water, do it now. Come back in and we'll get started. If my
3   decisions regarding those motions are helpful, then let the
4   court know if you need additional time. *THEY GET EVERYTHING*

5           MS. SCHWARZ:  Okay.

*NOT*

6           THE COURT:  If not, we'll just keep going.  Okay?
7   And then like I said, we'll take a break just before 11:30.
8   All right.   *WHAT*

9           MS. SCHWARZ:  Thank you.

10          BAILIFF:  All rise.

11          (At 9:39 a.m., matter is recessed.)   *14 MIN*

12          (At 9:53 a.m., matter is reconvened.)

13          BAILIFF:  All rise.  Probate and Family Court for
14  the County of Clare is now in session, the Honorable Marcy A.
15  Klaus presiding.

16          THE COURT:  Thank you.  Have a seat please.

17          MR. DAVIS:  Ravi?  Ravi?

18          THE COURT:  Mr. Davis, go ahead and have a seat
19  please.

20          MR. GURUMURTHY:  Have a seat please.

21          THE COURT:  So, we are back on the record in the
22  matter of Crystle Davis, file 17069NA.  And the record will
23  reflect that all counsel are present as are both the mother
24  and the father.  And we took a short break.  It was a little
25  longer than I had anticipated.  And are we ready to go

*14 MIN WAIT FOR D.A. ADMISSIONS 7 MIN*

24

1  forward?

2  MS. SCHWARZ:  Actually, your Honor, we need a

3  little bit more time.  The respondent father's counsel

4  presented to us that if we put together some admissions, that

5  -- that they would consider those.  As they indicated when

6  they argued the motion, is they would be willing to make

7  admissions but, so the five minutes that I had to talk with

8  my client about your rulings and the ramifications relating

9  to that.  We just need a little bit more time to put together

10  some proposals.  And maybe would resolve this case.

11  THE COURT:  All right.  Thank you.  Mr. Gurumurthy,

12  is that true?

13  MR. GURUMURTHY:  That is correct your Honor.

14  Again, after the Court's ruling with what we have in the

15  allegations, my client indicates most of them again, as it

16  relates to Crystle are untrue.  So, maybe we can decipher what

17  those are, and we could maybe in the next five minutes, seven

18  minutes have something that -- he's already done the psych

19  eval, we've already presented that.  So, I think the

20  Department knows where this is probably going to go.  It might

21  give them an opportunity to put something together that my

22  client can review and say, okay, this makes sense, or it

23  doesn't, I don't know.

24  THE COURT:  All right.  So, Mr. Davis I'm not going

25  to waste today.  I have time guidelines that I have to follow

*Handwritten annotations: "PROSECUTER", "5 MINTS", "7 DAYS NOT 5 MIN", "BAIRNS", "NO NO", "NOT ?", "JUDGE", "7-DAYS OR", "OVER 182 DAYS"*

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

1  so, we're going to have either a trial or admissions today.
2  One or the other. So, it sounds like everyone's talking now,
3  which is a good thing. Maybe we can get this moving forward
4  so that if there are admissions, reunification is the goal.
5  So, we can start this down the road and get you and your
6  daughter into some productive services and get you guys back
7  together. So, that's if there are admissions. If we go
8  through a trial, that's fine too. I don't know what the
9  outcome of a trial would be. But I don't want to waste today
10  and I know the attorneys are ready to go and they probably
11  don't want to waste their time either. So, I will give until
12  10:30 --
13      MS. SCHWARZ: Thank you.
14      THE COURT: -- that should be ample time given what
15  you've told me. And if you're ready earlier then that's fine,
16  just let me know.
17      MS. SCHWARZ: We'll let you --
18      THE COURT: And then if there's no resolution, if
19  you -- Mr. Davis, I want you and Mr. Gurumurthy to hear this,
20  so you know. If there's no resolution by 10:30, then we're
21  gonna go. Okay? So --.
22      MR. GURUMURTHY: Correct. Your Honor, my client
23  has a question for the Court. I've explained to him what
24  admissions are, he'd like to hear it from the Court --
25      THE COURT: Okay.

26

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

MR. GURUMURTHY: -- because his position with how this whole matter has transpired is, he does not trust attorney's. So --

THE COURT: All right.

MR. GURUMURTHY: -- if the Court would be kind enough to explain to him, if he were to make admissions, what those admissions are. It's not a guilty plea. It's not a not guilty verdict. He's not being charged with child abuse. I've told him that, but I think he needs to hear it from the bench.

THE COURT: Okay. So, is that what you need to know, Mr. Davis? You're wondering what admissions -- what that means in this court?

MR. DAVIS: Pretty much pertaining to the actual documents that hadn't been already proved as --

THE COURT: Okay. Well let me -- let me --

MR. DAVIS: -- manufactured --

THE COURT: -- tell you this. I want to tell you what admissions mean in this courtroom. 'Cuz we're different. This is a different courtroom.

MR. DAVIS: I'm seeing this.

THE COURT: It is. This is not a criminal case. There's nothing to do with a criminal case in here. This is just a civil case. And this is Family Court. So, when any parent comes into this court under these types of

27

*(handwritten annotations throughout:)*

NO CHOICE

BASED ON PURGERY

LIE PURGERY

JUDGE SAID NOT GUILTY 3X

NOT COURT ORDER

LIE LIE LIE SAID SHE CHANGE HER MIND KLOPS

DISTRUST

NOT ALL RIGHT

NEVER OFFERED

NO

TWIST & CONN

JUDGE NOT ROD

ONLY

JUST MADE IT WORSE

---

1  circumstances where we have a petition that's been filed, and
2  allegations made.  If a parent chooses to come in to this
3  courtroom and make admissions, they admit to some or all of
4  the allegations in the petition. So, they -- they would go
5  through the petition and they say admit to certain portions
6  of the allegations in the petition.  And when you make those
7  admission, it's not guilt.  It's not guilty, not guilty, it's
8  admitting. So, it's admitting to some facts. So, establish
9  some facts so that I have something to go forward with.
10      When I say go forward, this Court is all based on
11  reunification of the family, getting the family back together
12  and offering any services, so any therapy or any counseling,
13  or any help that a family needs in order to stabilize the
14  family and get things back on track for the family. So,
15  that's the whole goal here.  The whole goal is to get the
16  family back together but get it back together in a healthy,
17  really good way.  Okay? So, that's kind of a -- that a --
18  kind of a basic way to put it but I think it's understandable
19  when I say it that way.
20      MR. DAVIS:  It's kind of vague in my eyes is
21  because the one of the things I would admit to, it's not on
22  this petition, is our family suffers from poverty.
23      THE COURT: All right. Well, listen, that's one of
24  the services that can be offered, is to help alleviate some
25  of the hardships that come with poverty. So, that's -- that's

28

1   one of the services that can be offered is help in that area.

2   But I can't -- I can't do anything.  The Judge, or the court

3   in these circumstances, anywhere in the state of Michigan, we

4   can't do anything until we have what's called jurisdiction.

5   And jurisdiction only comes -- I only have the power to help

6   if there are admissions or if I go through a trial and I find

7   that it's appropriate that I take what is called jurisdiction

8   or I take -- they use the word power.  But I take power or

9   control over a family and help that family.  And then I can

10  order everybody to do things.  I can order the Department to

11  help you.  I can order you to go to things to help you.  I

12  can order your daughter to go to therapy to help her.  I can

13  order both of you to go to therapy and counseling to help out

14  your family.  But until I -- I go through either a trial

15  process or I go through an admissions process with a parent,

16  I can't do anything.  I'm just here to listen until that

17  happens.  Until there are admissions or until I have a trial

18  and I find that it's appropriate that I take control over a

19  case.

20          MR. DAVIS:  I understand that.

21          THE COURT:  I take jurisdiction.  Okay?

22          MR. DAVIS:  The part that I'm not having an easy

23  time understanding is -- it actually becomes financial is

24  because to abide in all these demands, is that I could not

25  make admissions to that I can abide in them because

financially this is what started this whole thing to begin
with. Because I tried to get this done on my own.

THE COURT: Well, I'm gonna stop you there Mr.
Davis. Mr. Davis, I'm gonna stop you because I don't want
you to say something that you -- I don't want you to create
your own problem here, okay? So, I'm trying to be respectful
of what you want to tell me but I gotta stop you at the same
time so that I protect your legal rights, just like your
attorney is doing.

MR. DAVIS: Pretty sure by now, you've already
understood anyways.

THE COURT: And so, when -- when a parent comes to
this court, we go through the admissions process or we go
through a trial and I take jurisdiction, so I take some
control and power over the family to order them to do things.
Then when I order you to do certain services, then at the
same time, the Department usually voluntarily, but if they
don't do it voluntarily, then I can order them to provide gas
cards, telephones. I can order them to provide some
financial help. You can shake your head and put your head
down --

MR. DAVIS: Oh no. I'm sorry. I'm sorry.

THE COURT: -- but we're all limited here. Okay. I
don't have a pile of money that I reach into and I give to
you. All I have are the services that the State of Michigan

30

*STATE OF MI RIGHTS HAVE BEEN TAKEN!*

*OUT TAKE*

1   offers and that's all the Department has as well.  So, if

2   it's a -- if it's -- we can't tackle these things until we

3   get there either. So, you can anticipate I'm gonna fail, I'm

4   gonna fail, I'm gonna fail. We don't know that. You may be

5   very, very successful and you don't even know it yet. So, we

6   can't cross that bridge until we come to it.  So, each

7   family's different and each family has different issues and

8   problems that we try to solve.  Okay?

*I KNEW IT*

*SAME FORMAT FOR NOT EVERY ONE*

*WHO SAID THIS*

9          MR. DAVIS:  My -- my one issue that I think would

10   really help everyone in this case was just shortly before

11   this had happened because of the bus stop issue.  Was I was

12   going to petition the courts and I'm not sure if I would have

13   been in the correct court here, was to petition the court so

14   that Crystle could have mental evaluations done and that she

15   could be evaluated as needing a -- a supplementary income as

16   did her mother for many years still.

*SSI*

17          THE COURT:  All right.  Well, those are -- those

18   are answers that we can give you through these types of

19   cases.  So, I'm just talking real general terms. But often

20   times, those are things that we discover in these cases that

21   no one would have known but for the case happening.  So,

22   you're     I think part of the issue is if we were traveling

23   down a road, I'm still at the stop sign and you're about five

24   miles ahead of me.  So, I've got to get you back to the stop

25   sign so we can start at the same place and move forward. And

*13 YRS*
*13 MIN*

*CHECK WITH ENTERPRISE FIRST*

31

1    that -- in all these types of family law cases, where we have

2    protective proceedings, if we do it all together at the same

3    time, we can be successful, but if we're -- if we're lurching

4    around and not working together it falls apart. *PURGERY*

5    MR. DAVIS: It's just these admissions are scary. *NO TIME*

6    MR. GURUMURTHY: No. I heard that before. *NOT ENUF*

7    THE COURT: So, I'm gonna stop here because I'm

8    eating up your time and I don't want to do that. So, you got

9    about 27 more minutes to go. Court's in recess. *TIME FOR*

10   MR. GURUMURTHY: Thank you, your Honor. *PLAY* *NO TIME*

11   BAILIFF: All rise. *WHY THANK HER* *FOR*

12   (At 10:02 a.m., matter is recessed.) *28 MIN* *JUSTIS*

13   (At 10:30 a.m., matter is reconvened.)

14   BAILIFF: All rise. Probate and Family Court for

15   the County of Clare is now in session, the Honorable Judge

16   Marcy A. Klaus presiding.

17   THE COURT: Thank you. Have a seat please. So, it

18   is 10:30 and I'm going back on the record in the matter of

19   Crystle Davis, file 17069NA. And we are missing the

20   petitioner and her attorney. Mr. Gurumurthy, did you have the

21   opportunity to look at some proposed admissions for your

22   client.

23   MR. GURUMURTHY: I was just handed them as I was

24   walking inside the courtroom. I haven't had a chance to

25   review them with my client or thoroughly review them myself.

*BUMS RUSH* *JUST DO IT*

*WE NEVER HAD Q/A*

32

1   THE COURT:  All right.

2   MR. GURUMURTHY:  But I do have them here.  I do

3   have a PATP that's dated 11-7-2017.  We can argue that on the

4   record after admissions were made, but --   *OUT TAKE*

5   THE COURT:  Okay.

6   MR. GURUMURTHY:  -- I do have them in my hand right

7   now.   *PROSACOTER*

8   *PROS* THE COURT:  All right. So, if you want to use our

9   conference room for about five minutes, we'll see if we can

10  find the Prosecutor and get things rolling here.

11  MR. GURUMURTHY:  Okay.   *5 MIN RUDE*

12  *COULD NOT*  THE COURT:  Okay?   *INTERRUPTED*

13  *HEAR SINES*  MR. GURUMURTHY:  Thank you.   *TIME*

14  *B.P. H/OH*  THE COURT:  So, it's interesting it happens right

15  at 10:30 when I said that's when we'd go back on record that

16  they're handed to you so. All right. Thank you.   *NOT 7*

17  MR. GURUMURTHY:  Thank you.   *DAYS*

18  THE COURT:  I'm gonna remain here.  We'll go off

19  the record?

20  (At 10:32 a.m., matter is recessed.)   *13 MIN*

21  (At 10:45 a.m., matter is reconvened.)

22  THE COURT:  All right. We'll go back on the record

23  in the matter of Crystle Davis, file 16019NA, and I think

24  that should be 17 actually, 069NA.  And the record will

25  reflect that all counsel are present as are both the mother

33

1  and the father in this case. And the Court's taken a couple

2  of breaks here. And Mr. Gurumurthy, is your client ready to

3  go forward?

4  MR. GURUMURTHY: Your Honor, after discussing with

5  my client the proposed admissions that were handed to us this

6  morning, my client is willing to go forward. He would like to

7  explain all the admissions. There are certain changes that

8  I've made, but given we're delayed, I will just read them

9  very slowly on the record. I think there is still enough for

10 the Court to take jurisdiction and we can go forward with

11 those admissions.

12 One of the other things that I was just handed, is

13 and I asked all the parties if there was an inquiry made

14 about whether this family had any Indian heritage. There has

15 been an inquiry made but nothing has been received. My

16 client has a letter saying he is part of a tribe. He can

17 explain that. So, look at this is not a removal, so I don't

18 think the tribe is going to be involved with any of those

19 proceedings, but I can make copies of these. I haven't

20 totally reviewed them but there is something from the

21 Michigan Indian Legal Services in Traverse City that

22 indicates that he has also indicated that there is Indian

23 heritage.

24 THE COURT: All right. Thank you. So, we'll just

25 kind of go slowly through this --

34

[Handwritten annotations: "WHAT", "WHY WOULD HE SAY THIS!! WOULDN'T WORKING FOR THE PROSECUTER & JUDGE", "LIED TO", "NOT 7 DAY", "NOT", "WORKING FOR THE COURT", "CON", "NOT", "ENTERPRISE / MY LAWYER", "RAUL", "DIDNT WANT TO THINK", "CUT OFF", "JUST IGNORED IT", "NOT INTERED", "4 HR", "5 MIN OF ADVICE", "RAUL WISH TRIBE"]

*[Handwritten: NOTHING SLOW ABOUT IT HURRY WE ARE RUNNING OUT OF TIME]*

1   MR. GURUMURTHY: Correct.

2   THE COURT: -- so that I can keep up with

3   everything as well as Mr. Davis, okay?

4   MR. GURUMURTHY: And Mr. Davis would like to

5   explain each and every one of them.

6   THE COURT: Okay. So, Mr. Davis do you have gum in

7   your mouth?

8   MR. DAVIS: I'm sorry. But my breath was so bad I

9   couldn't even swallow.

10   THE COURT: All right. So, we're recording this, so

11   *[Handwritten: →]* you make your admissions, I'm gonna ask that you remove your

12   gum. *[Handwritten: ME DISTRACT]*

13   MR. DAVIS: Sure.

14   THE COURT: And so that we have a nice clear

15   recording and I think Ms. Howe has just given you a cough

16   *[Handwritten: WHAT THE DIF]* drop, so if you need that when you're done, you can certainly

17   use that cough drop. *[Handwritten: WHY WOULD I NEED IT THEN!]*

18   MR. DAVIS: It's just the dryness from sinuses

19   dripping.

20   THE COURT: Okay. So, if you'll just remove the gum

21   that'll make *[Handwritten: of]* then we'll make sure your voice is nice and

22   clear on the recording.

23   MR. DAVIS: Wish I could have chewed it for five

24   more minutes.

25   THE COURT: Sorry. *[Handwritten: NOT FEAR FEAR I COULD TASTE FEAR CON!]*

*[Handwritten left margin: I DID NOT WANT O DO THIS]*

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

1    MR. DAVIS:  I was doing it not to embarrass myself

2  with these people so close to me.

3    THE COURT: We are ruled by the Court, or by the

4  clock.  The Court's ruled by the clock I should say.  So, Mr.

5  Davis I want to go through what -- what we're doing here. So,

6  you're going to be placing some admissions on the record,

7  correct?

8    MR. DAVIS:  Yes.

9    THE COURT:  And Mr. Davis, you understand that by

10  going forward with admissions, you're giving up your right to

11  have a trial.  So, we will not have a trial in this case, do

12  you understand that?

13    MR. DAVIS:  I do in a sense.  I mean, because my

14  family does need the medical help.

15    THE COURT:  I'm gonna stop you there.  Do you

16  understand that we won't have a trial if we go forward with

17  admissions today?  Just that simple question.

18    MR. DAVIS:  I've not even been given a choice yet

19  to determine yet.

20    THE COURT:  You have Mr. Davis.  You've been given

21  that choice multiple times and that's why I've delayed the

22  matter for almost two hours this morning.  Because I was

23  ready to go at nine o'clock for a trial. But there are

24  indications that admissions may be appropriate in this case

25  after I made some rulings. And you've had plenty of time at

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

*[Handwritten annotations throughout margins: "NOT ENOUGH TIME", "NOT JUSTICE", "CONING ME", "DONT WANT TO", "SOME", "NO I DID NOT KNOW THIS", "I NEVER GIVE UP MY RIGHTS", "ONLY - CREATE DOUGHTER", "CONNE", "NOT THAT SIMPLE", "PRESSER HURY HURRY", "HURRY", "7 MIN", "TILL I GAVE INTO PRESSURE", "CON", "JURY WENT HOME A[S]", "NOT", "AFTER", "COULD SHE JUST NOT ASSEPT THE FACT D ROD ID NOT WANT ANY ADMISSIONS", "JUDG DID NOT WANT TRIEL DID NOT HAVE SOP FOR WITTNES", "5 MIN I WANT TRIEL FOR A YEAR"]*

*[Handwritten: NO I DID NOT STILL MAD ABOUT JER DARE ON CASE]*

1  *[NOT]* this point to consider those, discuss them with your *[LIEING]*

2  attorney. Just in regards to -- are we having admissions or

3  are we having a trial? You represented to me that we're *[7 MIN ACTUAL 5 MIN]*

4  having admissions today. So, that's what we're going to do *[CONED]*

5  next. Do you understand that? That you'll be making *[DID NOT ASK]*

6  admissions? *[CONN ME] [DID NOT MAU TO]*

7  MR. DAVIS: I understand the procedure, I wish that

8  I had had more time to think about it. *[NO MORE TIME]*

9  THE COURT: Okay. That's all I'm -- that's all I'm

10  asking you. If you understand procedurally that we'll be *[TELLING]*

11  making -- you'll be making admissions --

12  MR. DAVIS: Yes.

13  THE COURT: -- and not having a trial. Do you

14  understand that just procedurally? *[NO TO DAY]*

15  MR. DAVIS: I don't want to admit to anything I

16  didn't do. There are a couple things on there -- *[OR CUT OFF]*

17  THE COURT: Mr. Davis, do you understand that you

18  will not have a trial if you made admissions? Yes or no? *[TO DAY]*

19  MR. GURUMURTHY: You're not admitting to anything

20  you didn't do. These are what we went over. *[NO WE DID NOT 7 MIN RUDELY]*

21  MR. DAVIS: All right. I'll -- I'll admit to the *[NOT BUMS RUSH]*

22  things that are on here. *[CONED]*

23  THE COURT: Okay. I'll stop you there. It's a

24  simple question. You're overcomplicating this and you're

25  getting yourself all wound up by making it more complicated *[VERRY COMPLACATED]*

*[Left margin handwritten: THOUGHT WE WERE HAVING TRIAL DAY]*

*[Left margin handwritten: WHY DID SHE NOT STOP ME HERE]*

*[Bottom handwritten: NO THE COURT SEE I DID NOT UNDER STAND I WAS TERRISED CON CON]*

*[Bottom left handwritten: NOT COMPLICAT CON I SAID NO ADDMISSION CON SHE WOULD NOT ASK ED WHAT A CONN]*

37

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

*FORCE NOT CHOISE*

1  than it is. So, you gotta follow me, okay? So, when you

2  make the admissions today, you're gonna place those on the

*WERE*

3  record. You can offer an explanation and that's what I    *JUDGE*

4  understand you're going to do, is that you're going to make

5  the admission, then you're gonna offer a short explanation to

6  me. And that's fine. Do you understand that?

7            MS. DAVIS: Sure.  *I DIDN'T LIKE THE CON*

8            THE COURT: Okay. And there won't be any witnesses

9  called to testify on your behalf. You won't cross-examine

10  any witnesses. I won't subpoena any witnesses because we're

11  making you you're making admissions today. And we'll proceed

*FORCED TO*

12  forward after you make those admissions. So, I'm gonna have

13  you stand up and raise your right hand to be sworn in.

14            MR. DAVIS: I'm most uncomfortable with this.

*REQUEST*

15            MR. GURUMURTHY: Well then — then have your trial.

*NOT*

16            THE COURT: All right   *I SAID NO NOT ALKIO45.*

17            RECORDER: Do you swear or affirm the testimony you

18  are about to give shall be the truth, the whole truth, and

19  nothing but the truth?

20            MR. DAVIS: Yes.   *? CONNED*   *I SAID NO*

21            THE COURT: Go ahead and have a seat. Now Mr.

22  Davis, go ahead and sit down. Mr. Gurumurthy's gonna ask you

23  the questions that are written out that you've gone over with

24  him in the -- in the conference room. And first I'll be

listening for the word admit and then I'll listen for your

*THE MAGIC  NOT A  AGREEMENT*
*WORD NOT ADMISSION*

*4 MINITS*

*NOT ADMISS*
*HOW MANY TIME DID I HAVE TO SAY NO ADDMISS*
*IS THIS PROS*
*AGIN DID NOT WANT TO DO THS*
*TO LATE I SAID COURT*
*NO ADDMISS YET*
*INTERRUPTED 3X TOLD TO HURRY UP*
*CON CON CON CON*

*(handwritten: NO NOT ENOUGH)*

1  explanation.  Okay?  Does that make sense?

2       MR. DAVIS:  Kind of want to say it the other way

3  around, but that will be fine.

4       THE COURT:  That's how I'm gonna tell you to do it.

5       MR. DAVIS:  Yes.

6       THE COURT:  Okay? All right.  So, Mr. Gurumurthy?

7       MR. GURUMURTHY:  Thank you, your Honor.  Mr. Davis,

8  you heard what the Judge had to say, correct?

9       MR. DAVIS:  Yes.

10      MR. GURUMURTHY:  Now I'm gonna read some of the

11  allegations that we went over in the conference room that was

12  just handed to us this morning.  We had a chance to review *(handwritten: NOT 7 DAYS)*

13  them.  And after I read each allegation, I would assume you

14  would admit to each allegation and then provide an *(handwritten: AGREE)*

15  explanation as you indicated you would like to provide,

16  correct?  Yes?

17      MR. DAVIS: Yes.

18      MR. GURUMURTHY:  Okay.  It's all being recorded

19  that's why I need you to answer yes or no.  Okay.  I'm gonna

20  read the first one.  One, Rodney Davis, date of birth 1-15-

21  1954 is the biological father of Misty Davis, date of birth,

22  11-16-1999 and Crystle Davis, date of birth 1-22-2004.

23      MR. DAVIS:  Yes.

24      MR. GURUMURTHY:  Okay.  Again, I'll read it again.

25  I don't know if that yes was to the --  *(handwritten: CUT OFF AGIN)*

*(handwritten: JUMP KANGA JUMP)*

39

1      MR. DAVIS:  Yes.

2      MR. GURUMURTHY:  -- question I answered.

*DISTRACTION*  3      MR. DAVIS:  Yes.  Yes, was the answer.

4      MR. GURUMURTHY:  Yes, to the (first) allegation.

5      MR. DAVIS:  Yes.

6      MR. GURUMURTHY:  Okay. Thank you. (Second)  Wendy

7  Davis, date of birth 5-30-1971 is the biological mother to

8  Misty Davis, date of birth, 11-16-1999 and Crystle Davis,

9  date of birth 1-22-2004.      *WHY THIS QUESTION*

10     MR. DAVIS:  Yes.

*RAM*  11     MR. GURUMURTHY:  (Three.)  Rodney Davis did not

12  execute a power of attorney for Crystle Davis while Rodney

13  Davis allowed Crystle to stay with Ruth Nordstrom(sic) to
                                    *VISIT*  *NORDgaar*
14  ~~attend~~ school, in other words, home school, (correct?)  To be
       *HOME*
15  home schooled three days a week?  Is that an admit or deny?

*DENI*  16     MR. DAVIS:  Oh. That's false.  *NO*

17     MR. GURUMURTHY:  You can explain that.  But isn't

18  that what occurred?

19     MR. DAVIS:  What was it that occurred?

20     MR. GURUMURTHY:  Was Crystle living with Ruth --

21  Ruth Nordstrom(sic)?

22     MR. DAVIS:  No, she was not living there.

23     MR. GURUMURTHY:  Was she staying with Ruth?  *VISIT*

24     MR. DAVIS:  She was being home schooled there.

25     MR. GURUMURTHY:  Okay. How many days a week?

*2½ (2)*

1    MR. DAVIS: Two and a half.

2    MR. GURUMURTHY: Okay. While she was staying with

3    Ruth being homeschooled, did you execute a written power of

4    attorney?

5    MR. DAVIS: I gave a written -- handwritten letter

6    that her father had written that I signed stating that I gave

7    her permission to be home -- I gave Ruth Nordman permission

8    to home school Crystle Davis at Ruth and Ron's home.

9    MR. GURUMURTHY: Mr. Davis, I want to ask you

10   again. Just answer the question. Was Ruth Nordstrom (sic)

11   given a power of attorney?

12   MR. DAVIS: No.

13   MR. GURUMURTHY: Okay. Do you want to explain

14   somebody else had a verbal power of attorney, correct?

15   MR. DAVIS: Right.

16   MR. GURUMURTHY: Go ahead.

17   MR. DAVIS: When she had gone up there, there was

18   reason to believe that it was brought up even at the very

19   beginning before she even went there the first time, was

20   there would be no need for power of attorney or temporary

21   custody orders is that they're only 30 minutes away and that

22   I could either bring her up there to go to school and hang

23   around and come back on days that she needed to be there.

24   There was never any need for a power of attorney because I've

25   got friends of ours that live close to where we are that are

41

1    very widely known and well respected and we've known them for

2    50 years.                    NOT SOP OR DEPISITION

3    [ROUND 2]  [1] GALOWAY    MR. GURUMURTHY:  What are the names of your

4    friends?

5        MR. DAVIS:  And it was a verbal agreement which I

6    found out in this day, a verbal agreement between two parties

7    is a binding contract.  That they would care for my children

8    if they were ever needed.

9        MR. GURUMURTHY:  What are the names of your

10   friends?

11       MR. DAVIS:  Mike Pitrowski and Julie Pitrowski.

12       MR. GURUMURTHY:  Do you know how to spell their

13   last name?

14       MR. DAVIS:  P-I-T-R-O-W-S-K-I.

15       THE COURT:  And so, you admit paragraph number three

16   with that explanation, is that fair to say?  NO

17       MR. DAVIS:  Seeming that was the contract that we

18   had between the -- CUT OFF. AGIN ⌐OUT TAKES

19       THE COURT:  You admit paragraph three with your

20   explanation, correct?

21       MR. DAVIS:  Yes.

22       THE COURT:  All right.  Thank you.

23       MR. GURUMURTHY:  Mr. Davis, I want to go forward

24   with number four okay?  Rodney Davis did not file an action

25   in the Probate Court to consent to a limited guardianship for

WHO EVER HEARD OF THIS ?

R NOW ONE ① TALKED TO

42

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

1  Crystle Davis while Rodney Davis allowed Crystle to stay with *NOT LIVE*

2  Ruth Nordstrom(sic) to attend school three days a week. *2 DAYS*
   *NORDMAN*

3  MR. DAVIS: Never would have known or needed to.

4  MR. GURUMURTHY: Okay.

5  MR. DAVIS: And I've already -- *CUT OFF AGIN*

6  MR. GURUMURTHY: Okay. Let me ask you that again.

7  *NO NEED* Did you come to Clare County Probate Court and file an action
   *FILE IN*

8  *AT PLEASA* in this Court regarding a limited Guardianship?

9  MR. DAVIS: No. I refused to give any limited

10  guardianship to that Ruth Nordman family. *DID NOT TRUST*

10  MR. GURUMURTHY: Okay.

   *CUT OFF* *CUT OFF AGIN*
   *EVERY TIME* *EXPLAINE* MR. DAVIS: I did not want them using it for --
   *TO EXPLANE*

13  THE COURT: All right. Mr. Davis, remember I asked

14  you make the admission and then offer the explanation. So, I

15  want you to follow my directions, okay? *BUT I GET CUT OFF*

16  *BE CONNED* MR. DAVIS: All right.

17  THE COURT: So, as to paragraph number (four,) do you

18  admit paragraph number (four?) And then I want to hear your

19  explanation.

20  MR. DAVIS: Yes, I admit to it.

21  THE COURT: All right. And now you can offer your

22  explanation, which you've already started to, so pick up

23  where you've left off.

24  MR. DAVIS: Well my explanation started with about

25  a month previous to this is that she was going to be

   *CPI*

1   attending school in the State of Ohio.  Is that we have --

2   THE COURT:  Who's that?  Crystle?

3   MR. DAVIS:  Yes.

4   THE COURT:  Living with whom?

5   MR. DAVIS:  With Ruth --

6   MR. GURUMURTHY:  Marylynn.  Marylynn.

7   MR. DAVIS:  -- I'm sorry.  With our friend Marylynn

8   who is very well off and have plenty of room, known my

9   children, known me for many years. And that their church has

10  a school and I felt the need that Crystle needs to be in a

11  more one-on-one type school as that she was not having good

12  reception at our school at the time.

13  THE COURT:  Good recept -- was she having trouble

14  in school?

15  MR. DAVIS:  Absolutely.

16  THE COURT:  Socially or academically or both?

17  MR. DAVIS:  Both.

18  THE COURT: All right.

19  MR. DAVIS:  Actually, her socially part was

20  contributing to her academic's failures.

21  THE COURT: All right. So, thank you for that.

22  Let's move on to paragraph number five. And at again

23  remember, I first want admit and then I want the explanation.

24  So, that's the order that we're going.

25  MR. DAVIS:  I'm not all the way done. I might –

44

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

*[handwritten annotations surround the transcript text]*

JUDGE PUT WORDS, I DID NOT SAY

YES

1  finishing up for you to understand, but those power of

2  attorney's would have been executed for Marylynn so that she

3  could cross state lines with my children. There was no need

4  to use them same power of attorney's with Ruth. NORDMAN

5       THE COURT: I'm gonna stop you there Mr. Davis.

6  'Cuz I understand. → ? DID SHE ////// NOT

7       MR. DAVIS: All right. OUT TAKE          OUT TAKE

8       THE COURT: And there's -- there's different -- this

AGIN JOKE

9  → is like a play, okay? And we've got a script that we follow.

NO                        ENTERPRISE

10       MR. DAVIS: All right. ?

11       THE COURT: And there are different parts that we

THIS IS NOT A PLAY

12  each play and there are different times for you offer further

13  information to me. So, I need limited information now.

REFUSED EXPLANE TO ADMIT

14  Further information comes later, okay? So, I'm not trying to

15  deny what you're telling me -- SHE DENY

AFTER IT'S TO LATE

16       MR. DAVIS: I just wanted you to understand.

17       THE COURT: -- I'm just trying to say -- I just,

18  ? no. I understand that. But it needs to come at a different

19  point. So, let's move on to paragraph number five.

NO EXP

20       MR. GURUMURTHY: Number five. And you and I have

WHO

21  made changes to it because -- so, I'll read those, and

22  everybody could follow those.

23       THE COURT: All right.

24       MR. GURUMURTHY: Five. Rodney Davis was convicted

25  of attempting to disturb the peace with a delayed sentence

PLE/BARGAN          JUST PAY 150 OFF R8
COULD NOT AFORD         TO COVER THEIR
JUSTIS $                ASSES
                        SHERIF DEP

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

*[handwritten: DAY 42]*

1  status on 12-6-2017. You can either admit first then

2  explain.

*[handwritten: AT SCHOOL NOT BUS STOP]*

3  MR. DAVIS: True.

4  MR. GURUMURTHY: Admit or deny?

5  MR. DAVIS: Admit. *[handwritten: ?]*

6  THE COURT: All right.

7  MR. GURUMURTHY: Okay. Now you want to explain

8  that? Go ahead sir.

*[handwritten: OUT TAKE]*

9  MR. DAVIS: This came -- this stemmed from a case

10  that originated at the same time that Crystle was kicked off

11  the bus is when we went with Plan B about having her to be

*[handwritten: OUT TAKE]*

12  schooled in another state. Was that the -- that she was

*[handwritten left margin: MARRY LENN OHIO]*

13  being kicked off the bus in front of my home, of course, I

14  hadn't any knowledge of this because it was through the

15  school system to evade me knowing.

*[handwritten: INTERAGATING CRYSTLE  BUILDIN]*

16  THE COURT: There was an issue with the neighbor.

17  Is that correct?

18  MR. DAVIS: Yes. And they were across the street.

19  THE COURT: And that's what this stems from,

20  correct?

21  MR. DAVIS: He --

*[handwritten: OUT TAKE CUT OFF ASIN ON EXPLANE]*

22  THE COURT: That's really all I need to know for

23  this purpose and then you're gonna tell me more about it

*[handwritten: LIPED]*

24  later on. But that's all I need to know for this purpose is

25  that -- that's what it comes from and you're on a -- are you

*[handwritten: (ATEMPED TO DISTURB THE PEACE)  JOKE]*

46

*[handwritten: BULL SHIT! COPS NOT AREST! TILL PAY 1500$]*

1  currently on a delayed sentence through District Court or is

2  that done?

3  　　　　MR. DAVIS: Yea. I just gotta make one more

4  payment to them and it's over. *[handwritten: 50$  ALL ABOUT 1 ROD. HAD NONE]*

*[handwritten: AS IN W/O EXP]*

5  　　　　THE COURT: Okay. All right. Well, that's a good

6  thing. That's all I want to know and I'm gonna stop you

7  there. 'Cuz you're -- no. You're ending on a positive and *[handwritten: OUT TAKE  NOT FOR ME]*

8  you -- Mr. Davis? That's one of the rules. I told you it's *[handwritten: OUT TAKE]*

9  a play and I'm the director. So, I tell you when to start and *[handwritten: JOKE]*

10  when to stop, okay? So, I'm telling you to stop here because

11  we need to move on to paragraph six. Paragraph number six *[handwritten: NOT CUT OFF]*

12  Mr. Gurumurthy? *[handwritten: THIS WAS NOT ADMIT]*

13  　　　　MR. GURUMURTHY: Thank you, your Honor. On number

14  six. On October 16, 2017, Rodney Davis called CMH, Community

15  Mental Health to complete an intake for Crystle but lost

16  connection on the call. Admit or deny?

17  　　　　MR. DAVIS: Admit. I keep wanting to say true. *[handwritten: RAN OUT OF TIME ON PHONE CARD]*

18  　　　　THE COURT: All right. *[handwritten: JUDGE]*

19  　　　　MR. GURUMURTHY: Okay. Number seven. Since that

20  time, Rodney Davis has not followed up to complete the CMH

21  intake due to Ms. Bianca Hernandez not giving Rodney gas *[handwritten: THEY DHS BANE & HERNADAZ PURGED ON WARNT TOOK CHY]*

22  cards and Mr. Jereme Bear, both of DHS did not make a

23  referral to CMH regarding the intake? Admit or deny? I know

24  I've scribbled those.

25  　　　　MR. DAVIS: Well, I'm not real sure how I'm

*[handwritten: 10 (16) 17 DAYS AT RODS]*

*[handwritten: WAITING FOR REFERAL]*

47

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

1     supposed to admit to something that nothing happened.

2         MR. GURUMURTHY: But is that what happened?

3         MR. DAVIS: It was the other parties. *[handwritten: OUT TAKE]*

4         MR. GURUMURTHY: Okay. You can explain that. But

5     is that what happened? You didn't follow up -- *[handwritten: NOT TILL THE 3RD OF MAY]*

6         MR. DAVIS: I admit that happened.

7     *[handwritten: I WAS LIED TO]* THE COURT: So, I want to be clear. So, you're

8     admitting that you did not follow up to complete this -- the

9     community mental health intake and then you're gonna offer an *[handwritten: GET CARD OR REF]*

10     explanation as to why?

11         MR. DAVIS: Yes.

12         THE COURT: Okay. So, you admit to not following up

13     on the CMH intake?

14         MR. DAVIS: Yes.

15         THE COURT: All right. Now you can offer the

16     explanation.

17         MR. DAVIS: At the time that we had seven

18     witnesses, I was offered to take Crystle to mental health, is

19     that she needed counseling, which I had already known. And

20     had already planned on doing that. But just as it states in

21     here about financially. Is that I told them that financially

22     I couldn't do it at that time because it was the middle of

23     *[handwritten: OCT 18]* the month. I wasn't prepared. Wasn't asked to do this by the *[handwritten: WAS LIE]*

24     end of the month and I would have money and do that. I was

25     told by Jereme Bear was that he would get a referral so that

*[handwritten annotations in margins: "I BAGE IS HERNA", "RESPONC QBILTY", "HE LIED 10X BUYING TIME", "NECER TRYED LIED", "OCT 25 BOOK CLOSED", "GOT WARNT INSTEAD", "1130 AT N16 AT"]*

48

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

*[handwritten annotations throughout: "WITH WITNESS PRESENT", "+ ROD SAID THIS", "DHSM", "CPS JERRY BARE", "CPS", "NEVER TRIED LIE ABOUT FELLON, MEDS ADVICE", "OUT TAKE OFF ON PERJUS CUT OFF EXP AGAIN", "OUT TAKE", "OUT TAKE DAUGHTER", "JER BARE REMOVED PURGERY TAKEN OUT OF CONTEXT", "FOR CRY"]*

1  they could come out to our home and it wouldn't cost us

2  anything. Great. I said, all right, now we're moving in the

3  right direction. And as an alternative, Bianca Hernandez,

4  I'm not sure if Jereme just put her on the task of making

5  sure we had fuel cards as an alternative to get us up there.

6  Both failed miserably as --

7  THE COURT: All right. Thank you, Mr. Davis. I'm

8  gonna -- this is where I get to stop you again. So, we're

9  gonna move on to paragraph number eight.

10  MR. GURUMURTHY: Number eight. Rodney Davis agrees

11  that he is financially unable to obtain mental health

12  services for his -- for his family needs and stipulates to

13  the court taking jurisdiction over Crystle Davis.

14  THE COURT: I'm gonna take one part out of that.

15  The Court cannot accept a stipulation by a parent to take

16  jurisdiction. So, in other words, we can't make that

17  agreement. So, I just want to remove that second half of the

18  sentence because that would not be appropriate. But the first

19  portion that you just stated Mr. Gurumurthy is appropriate.

20  So, would you restate that to Mr. Davis and we can hear what

21  he has to say?

22  MR. GURUMURTHY: Correct. I will your Honor, and

23  again just to correct it would mean mental health services.

24  THE COURT: Okay.

25  MR. GURUMURTHY: Rodney Davis, number eight, Rodney

49

*NOT ADMITT* [handwritten]

1    Davis agrees that he is financially unable to obtain mental

2    health services for Crystle Davis. Admit or deny?

3            MR. DAVIS:  Admit.

4            MR. GURUMURTHY:  Do you want to explain?

5            MR. DAVIS:  I would think that had already been

6    done.

7            MR. GURUMURTHY: Okay.  Thank you.

8            THE COURT:  I think it was Mr. Davis. Thank you for

9    that.  And thank you for your patience in listening to me

10   when I gave you instructions.  That's gonna be -- that's

11   gonna be key in this case in that when I give you

12   instructions, we need to work together on this and make sure

13   that you follow through, okay?

14           So, I am going to accept the admissions that you've

15   placed on the record.  I'm going to accept those admissions

16   with your explanations that you've offered as well.  And I

17   find that they have been made knowingly, understandingly and

18   voluntarily.  And so, the Court will take jurisdiction of

19   Crystle Davis through her father's admissions that have been

20   placed on the record.  And Mr. Gurumurthy, if I could have a

21   copy of the -- the amendments that you made to those

22   admissions.

23           MR. GURUMURTHY:   I can, your Honor. Absolutely.

24           THE COURT: I just want to make sure I have that in

25   the file, so I have the right admissions in the case.

*I NEVER DID ANYTHING VOLUNTARY NOT SUBMITTED* [handwritten, left margin]

*NOT ADM* [handwritten]

*AGREEMENT NOT* [handwritten, bottom]

50

1    MR. GURUMURTHY:   They are my -- my scribbled notes
2  but yes.
3          THE COURT:  Okay. Thank you.  Do we have the parent
4  -- a proposed parent-agency treatment plan?
5          MS. SCHWARZ:  What we prepared, your Honor, a
6  parent-agency agreement and treatment plan back in November,
7  November 7th, 2017.  And it addressed everybody in the family
8  which was distributed out to everybody, I believe, at least
9  it has been prior to this hearing.
10         THE COURT: Do you have that Mr. Gurumurthy?
11         MR. GURUMURTHY:   I do. Yes, your Honor.
12  *NOT PROPER*  THE COURT:  Pardon us for interrupting.  Okay.
                       *DA,*
13         MS. SCHWARZ:  We have on here three services to get
14  started with the services that we believe are needed for the
15  family and Crystle.
16         THE COURT:  Has Crystle started the CMH services
17  that are recommended for her?   *BY BARNS NO RONFAN*
18         MS. SCHWARZ:  Yes, she has.
19         THE COURT:  Okay.
20  *HERE'S*  MS. SCHWARZ:  And we want to continue with those
    *THE*
21  services, but I know the Court likes to enter those orders
22  specifically as it relates to -- to the parties.
23         THE COURT: All right.  Mr. Gurumurthy were you
24  able to go through the proposed parent-agency treatment plan
25  with Mr. Davis?   *ONLY 2 MIN*

*NOW DHS
BARB TRYING
TO HIDE BARNS
WITH HOLDING
EVIDANCE*

51

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

1    MR. GURUMURTHY:  I have your Honor. So, if we are

2  looking at Mr. Davis, the first one is psychological

3  evaluation with Doctor Barnes.  My client has completed his

4  psychological evaluation with George Ronan, who is a licensed

5  psychologist, a Ph.D. in Mt. Pleasant.  All parties are

6  served with that evaluation.  He has completed that.  I don't

7  think there is a need to go see Doctor Barnes, so I think

8  he's already completed one of his -- his PATP requirements.

9    Sign all requested releases, my client -- that's

10  number three  And I will address number two in a minute,

11  that's gonna take a longer explanation.  I don't think my

12  client has any objection to signing any requested releases as

13  along as he can review it, his attorney can review it and

14  then we can sign it. That's been standard practice. I don't

15  think he has any objection to that.

16    MR. DAVIS:  (inaudible words.)

17    MR. GURUMURTHY:   In the future, if you have any

18  signed releases as this case progresses, I'll be able to

19  review any releases that are required.  You, of course, will

20  have the opportunity to review it.  Nobody's gonna just ask

21  you to blindly sign one, correct? Yes?

22    MR. DAVIS:  Yes.

23    MR. GURUMURTHY:   Okay.

24    MR. DAVIS:  Sorry.

25    MR. GURUMURTHY:  The second one is participating

52

1    with parenting times in accordance with DHHS guidelines. We

2    don't know what DHHS's guidelines are. So, we need some

3    clarification on what those guidelines are. Currently,

4    parenting time is at least via telephone. We -- I can address

5    that after the Court orders the PATP today. I'm going to be

6    asking at least some supervised, even -- even if it's at DHS.

7                 MR. DAVIS: Oh, so that's (inaudible words).

8                 THE COURT: Is there a reason family therapy was

9    not recommended?

10                MS. SCHWARZ: Well, the issue was is that Doctor

11   Barnes was to do the evaluation. He was the one that

12   evaluated Crystle and then come together as far as

13   recommendations for family counseling.

14                MR. DAVIS: No, I don't want this. I can't do

15   this. I said, you know -- (inaudible words). I'm mad. No.

16                THE COURT: Mr. Davis. Mr. Davis. I have to have

17   you be quiet while I have Ms. Schwarz talk.

18                MS. SCHWARZ: So, that is why we're requesting that

19   Doctor Barnes to do it because he is the one who evaluated

20   Crystle. The evaluation that he received from -- or we

21   received via email last week, is there were no

22   recommendations at all relating to any services as it relates

23   to family counseling. It was just an evaluation with -- with

24   no recommendations. We need those recommendations. We think

25   Doctor Barnes would be an appropriate person to do that

                                    53

                            Josette Given
                    Certified Electronic Recorder
              55th Judicial Circuit Court - Family Division
                    17th Judicial District Probate Court
                          Harrison, Michigan

1   seeing that he's already evaluated Crystle. So, we suspect

2   that Doctor Barnes, based upon his evaluation of Crystle,

3   would recommend family counseling, but we wanted that second

4   piece to be together so Doctor Barnes can make a well-

5   rounded, well thought out evaluation of recommended services

6   for this family to address the mental health issues that are

7   recognized by everybody.

8       THE COURT: I don't know that they are recognized

9   by everybody. That's the issue.

10      MS. SCHWARZ: Well, yeah. Well, as far as Crystle

11  is concerned and the family needs.

12      THE COURT: All right. And Doctor Barnes, I'm just

13  looking back at Doctor Barnes' psychological evaluation of

14  Crystle. Is she currently seeing an individual therapist?

15      MS. SCHWARZ: My understanding is she is. I don't

16  recall the name of that therapist right off the top of my

17  head.

18      MR. DAVIS: Katie.

19      MS. SCHWARZ: Katie Most. Excuse me.

20      THE COURT: Okay. Thank you. And as Guardian Ad

21  Litem Ms. Howe, regarding the parent-agency treatment plan,

22  looking at both these services for Crystle as well as for Mr.

23  Davis, your recommendation?

24      MS. HOWE: Well, I -- I received this to look at

25  while we were breaking as well. And I see it's dated November

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*



11-7-18

1  7th, and that was my first attention factor there, is there
2  doesn't appear to be -- Crystle is already participating in
3  individual therapy and the parent-agency treatment plan does
4  not provide for family therapy which the court has already
5  noted between Crystle and her father. And in addition to
6  that I would need this treatment plan to be modified to
7  address concerns noted in my report regarding with the mother
8  as well for Crystle.
9          THE COURT: All right. Any services or changes Ms.
10  Tomczyk on behalf of the mother? Any concerns?
11          MS. TOMCZYK:  On the services, your Honor, I think,
12  based on my review of the Guardian Ad Litem report, it
13  appears that although parenting time is not going poorly that
14  they may be assisted by some counseling which we would have
15  no objection to.
16          THE COURT:  Here is my suggestion.  This is an old
17  parent-agency treatment plan. We've got Doctor Ronan's report
18  now and there are some questions about Doctor Barnes'
19  involvement.  And I think Doctor Barnes and Doctor Ronan,
20  they need to talk to figure out if that's even necessary
21  really.  I would suggest that we reschedule --
22          MR. GURUMURTHY:    If I can interject when the
23  Court's done?
24          THE COURT: Go ahead.
25          MR. GURUMURTHY:  I'm just looking at both

55

*THIS IS VERRY IMPORTEN*
*CONTEMPT*

1     psychological reports, Judge. Doctor Barnes states a

2     recommendation. I mean, you know, clearly a subparagraph

3     recommendation, it states he does this with DHHS, he

4     contracted with DHHS, he knows what they're looking for,

5     that's why it's written that way. If you look at Doctor

6     Ronan's, it's not a recommendation, but he has conclusion

7     saying, you know, again that it may be that participating in

8     mental health service to learn more about effective

9     strategies for managing chronic pain might be useful. It

10     goes into saying, you know, that Mr. Davis was rather

11     defensive on the measure of psychiatric symptoms. So, I mean,

12     it goes into what he may need so this doesn't list out, he

13     gonna need A,B,C and D. But it's a paragraph of these things

14     could happens. So, and that is what I was going to suggest.

15     Maybe the two psychologists could discuss together as to and

16     put a plan together. This may give Doctor Ronan and again, an

17     option to look at Crystle's psychological evaluation as well.

18     I don't think both of them have looked at each other's.

19     THE COURT: All right. We're gonna reschedule dispo

20     to continue at a different day and time and so, we've got two

21     psychologists. I'm familiar with both of them. Both of them

22     do services for this so they're not unknown entities. And

23     certainly, they must -- it would be necessary for them to

24     speak. So, I will order for today that the -- Mr. Davis sign

25     any releases necessary so that Doctor Ronan and Doctor Barnes

*ENTER PRISE PROOF*

*DENIDE BY BARE*

*RONAN LOOK AT CRY & JUDGE*

*THIS IS WHAT JE BARE DID NOT WANT*

*JUDGE*

*I WNT TAKE*

*NEVER HAAPEND*
*BARE*

*DHS NEVER DID THIS*
*CONTEMPP*
*BARE*

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

*[handwritten notes in margins: RONAN & BARNS, JER HUMES, RONAN FIRED HIS DAD BARE, THIS, WHAT 1ST ACKNOLAG, BARE STILL ON JOB, FELLON, LIE, DEAD, BARE, 2X, FEB 22 18, BARE DEFIDE COURT ORDER CONTEMPT, HERES THAT BUT]*

1  can communicate with one another.  And then as I said, this

2  is an old parent-agency treatment plan and it's nice to have,

3  but I think we need to make some updates to it.  Especially

4  with input from Crystle's current therapist as well as input

5  from Doctor Barnes and Doctor Ronan.  So, let's make it a

6  little more detailed so that we're all on -- on track here.

7  It doesn't have to be more complicated just give us a little

8  bit better road map, so.

9  In the meantime, placement will continue as

10  previously ordered, in light of the Guardian Ad Litem report,

11  is that your recommendation as well Ms. Howe?

12          MS. HOWE:  That is my recommendation as well.

13          THE COURT: All right. And parenting time would

14  continue as previously ordered as well as between both mother

15  and father and Crystle.  But then we'll be back in a couple

16  weeks' time. So, this happens fairly quickly, so both of the

17  parents know, DHHS is going to probably going to be

18  contacting you. Make sure you answer their telephone calls

19  and respond to them because we need to work together to come

20  up with an appropriate parent-agency treatment plan. And then

21  Doctor Ronan and Doctor Barnes need to be able to communicate

22  as well with the Department and so those releases would be

23  necessary.

24          MR. GURUMURTHY:   And -- and Judge, I would simply

25  ask that there be an order that he get fuel cards and the

57

appropriate financial assistance in making these things

happens.  There have been some issues in the past that the

Department has given me two reasons.  One is that he hasn't

made any admissions  We're not ordered  We can't -- we can't

help him.  That's a valid answer.  The other one is the gas

cards are on a first come, first serve basis.  They're

already in and they're gone.  We can't -- so we can give him

rides.  My client absolutely requests that he not be allowed

or ordered to be a ride in the car with DHHS.  There have been

statements made by the Department that they were intimidated

by him, it doesn't make sense that if they were intimidated

by him, to put him in a car, go off with someone from DHHS to

drive him around.

          THE COURT:  Well --

          MR. GURUMURTHY:  He doesn't feel that that's

necessary either.  If he can get the appropriate amounts of

gas cards to get around and is financially helped, it might

be easier.

          THE COURT:  Okay.  So, does -- I'm not going to

order that today, Mr. Davis I'm gonna order that you fill out

a complete financial information statement to provide to DHS

and the Court, so I can take a look at it.  And I don't know

that I would order what you're asking.  You're not going to

be able to manipulate people or threaten people to get them

to do what you want.  It's not gonna work.  So, if you -- if

1  you can't get somewhere and you didn't get the gas card in

2  time, you're out of luck. Either you ride with them or get

3  there in line for a gas card.

4        MR. DAVIS:  Obviously, she's taking their side of

5  the story now about all that.

6        THE COURT:  So, at this point, I'm not gonna order

7  that of the Department --

8        MS. SCHWARZ:  Thank you.  *PROSCUTER*

9        THE COURT:  -- but I do need more information about

10 your finances because this issue keeps cropping up.  And so,

11 you need to be very open and honest about what your assets

12 are, and we'll go from there.

13        MS. TOMCZYK:  Your Honor?  *WENDY LAWYER*

14        THE COURT:  Yes, Ms. Tomczyk.

15        MS. TOMCZYK:  If we could, we would, noting in the

16 Guardian Ad Litem report that my client is only getting one

17 hour of parenting time a week, I would ask that DHS try and

18 fit in more parenting time per the schedule.  I think it's --

19        THE COURT:  I'm -- thank you Ms. Tomczyk. I'm gonna

20 leave that to the Department's discretion right now. And  *RACE*

21 hopefully they'll have a discussion with Crystle's therapist

22 as well to see how or if that should be increased.

23  *JER RACE*  MS. TOMCZYK: Okay. *STOP*

24        MS. HOWE: And -- and as Guardian Ad Litem, on the

25 one hour, and I can understand the request for more time, but

*THE FIRST TRUTH
OF THE MATTER*

59

*Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan*

1  Crystle participates in the Tuesday and Thursday after school

2  tutoring and she's getting assistance with an additional

3  tutor on Friday now for math, as well as her counseling

4  sessions which she's taking part in. So, it might just be a

5  matter of trying to have --

6  THE COURT: She's got a full plate and mom lives so

7  far away, that's my concern about order more time.

8  MS. TOMCZYK: And -- and -- yes. I guess this is

9  just kind of a formal request to DHS to try and see if we can

10  work some -- some more time out.

11  THE COURT: All right. So, I'll leave that to the

12  discretion -- at the discretion of the Department. All right.

13  MS. SCHWARZ: Thank you, your Honor.

14  THE COURT: Thank you. Court's in recess.

15  BAILIFF: All rise.

16  (At 11:15 a.m., matter is recessed.)

17

18

19

20

21

22

23

24

25

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

*DAY 382*

1  STATE OF MICHIGAN   )

2  COUNTY OF CLARE     )

3

4         I certify that this transcript consisting of 61

5  pages is a complete, true, and correct transcript to the best

6  of my ability of the respondent father's motion in limine,

7  motion to seek independent psychological evaluation and to

8  seek a second opinion of psychological evaluation, motion to

9  strike Department of Health and Human Services proposed

10  *DATE*

11  witness list and adjudicatory hearing held in this case at

12  the 55th Circuit Court-Family Division, Clare County, on

13  Thursday, February 22, 2018.

14         This transcript is only certified if the signature

15  below is original.

16

17

18  Date: 11-11-18        Josette Given CER 5277

19  365    382 DAY       55th Circuit Court-Family Division

20   17                  225 West Main Street
                         P O Box 96
21  382    LATER         Harrison Michigan 48625
                         (989) 539-7109
22

23              WHY DID THIS TAKE 264 DAY

24              ? ? ? ?

25

F 8    SEP 30
M 31   OCT 31
A 30   NOV 11                    61
M 31   264
J 30                     *Josette Given*
J 31   DAYS LATER   *Certified Electronic Recorder*
A 31           *55th Judicial Circuit Court - Family Division*
                *17th Judicial District Probate Court*
                    *Harrison, Michigan*

**Farwell High School**
**Farwell Area Early College**
**Timberland Alternative Education**
399 E. Michigan Avenue, Farwell MI 48622
www.farwellschools.net
989-588-9913 FHS/EC
989-588-7219 Timberland



Dee Yarger, Principal
**Jakob Veith, Assistant Principal**
**Jason Dykstra, Athletic Director**
**Lynette Lentovich, Farwell Area Early College Director**
**Robert First, Timberland Dean of Education**

District Mission Statement: Together with family and community, Farwell Area Schools will educate all students in a supportive environment, engaging them in learning through a variety of challenging experiences to ensure success in an ever-changing world.

September 14, 2017

Mr. Rodney Davis
9852 Cadillac Drive
Lake MI 47632

Dear Mr. Rodney Davis:

This letter is to verify action taken by the Farwell Area Schools that Mr. Rodney Davis is not allowed to enter upon Farwell Area School's grounds unless otherwise directed in writing by administration as a result of disorderly conduct on September 13, 2017 at the bus stop with the bus driver while infront of a bus full of students.

This no trespassing letter includes all school properties and all extracurricular events.  If you have any questions, please feel free to contact me at 588-9917.

Sincerely,

Dr. Yarger, Ed.D,
Principal Farwell High School, Timberland Alternative Education, Farwell Area Early College

Cc:     Farwell Area Schools Administration and Staff
        Clare County Sherriff's Office

RODNEY DAVIS     C/O  9852 ?

JALE MAYO 1-512-612-8422

TO PICK UP
CRYSTLE DAVIS

**Farwell High School**
**Farwell Area Early College**
**Timberland Alternative Education**
399 E. Michigan Avenue, Farwell MI  48622
www.farwellschools.net
989-588-9913 FHS/EC
989-588-7219 Timberland



**Dee Yarger, Principal**
**Tom Suggitt, Assistant Principal/Athletic Director**
**Lynette Lentovich, Farwell Area Early College Director**
**Robert First, Farwell Timberland Dean of Education**

District Mission Statement: Together with family and community, Farwell Area Schools will educate all students in a supportive environment, engaging them in learning through a variety of challenging experiences to ensure success in an ever-changing world.

October 12, 2017

Mr. Davis,

Enclosed is a 15-day attendance letter along with a state accountability form to address Crystle's attendance at Farwell High School.  At this time, we need the state accountability form filled out and sent back to Farwell High School or we will need to turn over truancy information to the Clare County prosecuting attorney's office.

Please fill out the form and return it by Friday, October 27th. *CRYSTLE WAS KIDNAPTED BY A SWAT TEAM BY J BARE LIE*

If you have any questions about this, please contact me at 989-588-9913 *I WOULD NEVER BE AVAIL  TO JUDGE & SHERIFF*

Sincerely,

*← WAS TOLD CRYSTLE NO LONGER ATTENDS FARWELL SCHOOLS*

Dr. Deanna Yarger
Principal
Farwell High School

*SHE IS BEING HOME SCHOOLED*
*WHY HAVE YOU NOT FORWARD HER*
*RECORDS PER REQUEST & ABSURD THEY*
*HAVE BEEN SEET*

*LIE*

TABLE OF CONTENTS

WITNESSES: PETITIONER                                                      PAGE
NONE




WITNESSES: GUARDIAN AD LITEM
NONE




WITNESSES: RESPONDENT FATHER
NONE




EXHIBITS                                        INTRODUCED     ADMITTED
NONE

2

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

1    Harrison, Michigan.

2    Tuesday, March 20, 2018 – 10:05 a.m.

3    THE COURT:  Calling the case of in the matter of

4    Crystle Davis.  This is file number 17069NA. Would counsel

5    identify please?

6    MS. SCHWARZ:  Thank you, your Honor. Chief

7    Assistant Prosecuting Attorney appearing on behalf of

8    petitioner, Eilisia Schwarz appearing on behalf of the

9    petitioner.

10   THE COURT: Thank you.

11   MS. HOWE:  Annette Howe, Guardian Ad Litem

12   appearing on behalf of the child, Crystle Davis.

13   THE COURT:  Thank you.  And the Court will use the

14   last Guardian Ad Litem report because it was recent.

15   MS. HOWE:  Thank you.  And I've provided that to

16   the attorney for the respondent father as well.

17   THE COURT:  Thank you, Ms. Howe.  And Mr.

18   Gurumurthy?

19   MR. GURUMURTHY:  And I've received that report as

20   well, Judge.  I'm Ravi Gurumurthy on behalf of Mr. Rodney

21   Davis.  He's here in the courtroom seated to my left.

22   THE COURT:  Thank you.  Mr. Davis, I'll have you

23   say your name please.

24   MR. DAVIS:  Rodney Davis.

25   THE COURT:  Thank you.  And Ms. Schwarz?

3

1    MS. SCHWARZ:  Thank you, your Honor.  I do believe
2  that, again the court received the -- I guess it'd be the
3  updated parent-agency agreement and treatment plan dated 3-5-
4  2018.  And I believe everybody has also received the court
5  report for -- that's also dated.  Can I --- let me start over.
6  The parent-agency agreement and treatment plan and the court
7  report along with the psychological evaluation (inaudible).
8  I believe those last two things we were talking about at the
9  last hearing.

10    However, I wanted to provide the court an update on
11  the PATP.  I know that after the last hearing, the court
12  wanted communication between Doctor Barnes and the evaluator
13  for Rodney Davis.  And we are trying very hard to make that
14  progress happen.  We have supplied releases to the respective
15  evaluators, so they can communicate with each other to set
16  forth a recommendation.  Likely coming from Doctor Barnes as
17  it relates to, what does Crystle need services-wise to be
18  able to repair, rebuild, strengthen that bond between she and
19  her father.  It's a slow progress because we're dealing with
20  two very busy people that is above and beyond the
21  psychological evaluation.

22    So, regretfully that's where we're at with number
23  one on the PATP.  So, we left -- we left it as such on the
24  PATP.  But other than that, that's where we're at with that.
25  We want the PATP ordered so that services can continue and

4

1   that they're court ordered for Rodney to participate in.

2          We would like to see Rodney participate in some

3   mental health services.  And just medical services as well as

4   it relates to his health.

5          I am gathering together all of the reports that Mr.

6   Bear has provided. And I have to apologize, there's been a

7   little bit of snafu on -- on how to get those reports so

8   they're available for distribution.  I have compiled those

9   reports and -- and summaries of the visits between Mr. Davis

10  and Crystle.  I directed Dusty Merritt, out of my office to

11  put those together in one packet so they're all together and

12  bringing us up to date on the summaries that those -- those

13  visits -- those telephone conversations with dad, whether

14  they happened or didn't happen.  So, the court has some

15  documents to review, specifically, coming from the person

16  who's doing the supervising in those visits.

17         Other than that, we're asking that the court

18  continue with this being a reunification case, that placement

19  continue.   That services are ordered.  Parenting time will be

20  within the discretion of the Department as far as it relates

21  to Rodney and Crystle.  And I believe that's all we have as

22  far as updates that aren't contained in those documents

23  previously presented.

24         THE COURT: All right.  Thank you.  Ms. Howe?

25         MS. HOWE:  Thank you, your Honor.  I've reviewed

5

the parent-agency treatment plan provided, dated 3-5-2018 in regards to Mr. Davis, and I do believe that that is appropriate.   However, parenting time is occurring by telephone now and we have a person supervising and perhaps that parenting time could be supervised by a therapist of either one of Mr. Davis and of Crystle, 'cuz things tend to get out of hand. But it doesn't appear that the supervisor of the telephone visits is exercising any type of authority and ending those discussions.   But it could be productive if -- if there was the appropriate healthcare professional to facilitate growth between the father and the daughter.

THE COURT:  All right. Would you think that face-to-face family therapy would be even better?

MS. HOWE:  At this time without -- I have not seen any type of mental health services that Mr. Davis has participated in to help facilitate positive face-to-face.  I do believe --

THE COURT: So perhaps in the future that would be appropriate?

MS. HOWE: Yes.  I don't oppose it in the future.  I think we have to take positive steps. And the first positive step would be through the verbal conversation. Because that can easily be ended by hanging up the telephone.  And maybe they could learn from things that were negatives that ended that telephone conversation.

6

1       THE COURT:  All right.  Mr. Gurumurthy?

2       MR. GURUMURTHY:  Thank you, your Honor.  You know,

3   I -- I don't think this parent-agency treatment plan is

4   appropriate.  If I look at what admissions Mr. Davis made,

5   they don't reflect the parent-agency treatment.  This is a

6   sandbagging backdoor way to get into what they want.  This is

7   not the process of Probate Court.  This is -- this is not the

8   process of a neglect nor abuse proceeding.  You don't -- this

9   is -- this is the admissions that the Department drafted,

10  agreed to, and that's what we were stuck with.  That's what

11  he made admissions to.  The parent-agency treatment plan must

12  reflect what admissions were made.  There is nothing in these

13  admissions, and I've read them numerous times, that go to,

14  Rodney Davis, mental health, Doctor Byron Barnes. Complete a

15  full psychological.  He's done one.  So, to have a second one

16  done is absurd.  We've been here a month and it is hard for

17  me to sit here and believe that these two professionals,

18  Ronan and Associates and Doctor Barnes have not sat together

19  and discussed and -- and figured out a plan.  So, now my

20  client is a month behind trying to figure out what else to

21  do.

22      Then, you have parenting time.  He's willing to

23  participate in any parenting time.  Again, the parenting time

24  over the phone is just absurd.  The last time we were in

25  court, the court made is very clear.  Six phone calls of

7

parenting time.  This is just -- that was the court's order.
This has just gone further than that.  It is longer than
that.  There has to be face-to-face parenting time.  I don't
give -- therapy supervisors or not, you have a mother with
her -- her boyfriend visiting and doing parenting time.  The
report indicates he's creepy.  He's got a picture of this
girl by his nightstand, in his wallet, telling this young
child about how he adores her pictures and looks at them.
This is creepy as hell and the Department allows this to
happen.  They won't stop.  Parenting time should be with the
parents and not some third party.  I've indicated this to the
Department numerous times and -- and nothing gets done with
it.  So, now you have Daryl, who shouldn't be there, is
participating in parenting times. The child indicates he's
creepy, I don't want him there.  She cries about it and goes
on.  But here, my client, who has raised these kids, he's got
two children. One for eighteen years that he's raised.
Crystle, thirteen years.  Never been part of the system.
Never had to go to (inaudible) and now we have a problem.
So, again, if there's a problem, that problem needs to be
fixed.  And needs to be looked at.

      And then I look at paragraph three, sign all
requested releases.  He's willing to do that if his
psychological -- his -- his psychologist and Doctor Barnes
have discussed and figure out a plan, he's indicated that at

8

*Josette Given*
*Certified Electronic Recorder*
*55th Judicial Circuit Court - Family Division*
*17th Judicial District Probate Court*
*Harrison, Michigan*

1    the last hearing.  I will sign any releases for those two to

2    communicate.  Not for DHS to figure out and -- and put in

3    things in place as to how they need to communicate.  That's

4    not the Department's job.  So, that hasn't been done.  He

5    hasn't been provided with any releases, at least that's what

6    he's indicated.

7         Again, medical health.  He's taking care of his

8    medical health. This, you know, trials and court proceedings

9    are stressful, but to use the stress of going to court and

10   fighting to get your child by going through the loops that

11   the Department puts in, does not turn into, oh, you have

12   medical condition.  So now you have to follow and do what we

13   want you to do medically.  There's nothing in these

14   admissions that report he's medically uncapable or medically

15   incapacitated to take care of his child. So, that shouldn't

16   be part of this.

17        Parenting skills.  Again, parenting skills only

18   occur when the parent and child are together.  They've kept

19   these parents, or at least my client who has been the primary

20   parent of this child for ten years plus, away from this

21   child.  How do they expect parenting abilities and skills to

22   be developed?  That makes no sense.

23        And then mental health. There is nothing in these

24   admissions that indicate that that mental health is a

25   necessity for -- for my client.  I spoke to his other

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

1   daughter shortly before coming into court, Misty, and she
2   indicated that she was on the phone with Crystle yesterday
3   and Crystle again, go into an argument with Misty.  So, it's
4   not just that it's my client who's starting the trouble and
5   getting into arguments, he's just being the parent.  Maybe he
6   needs some direction to -- to understand how to deal with
7   Crystle -- Crystle's behaviors.

8          But he has all along indicated money is the issue.
9   And if being in poverty prevents him from providing that --
10  so, if this is what it takes is the court to order the
11  Department to assist financially in getting to these
12  services, then that's what we do.  But to simply sit there
13  and say Mr. Davis is supposed to do all these things, that's
14  gonna fix Crystle and Mr. Davis's relationship, makes no
15  sense.  That's not what is going on here Judge.  You know, I
16  -- I, you know, I look back and I say now, I wish we had some
17  of the witnesses who would have testified, and that trial
18  would have happened because those witnesses, they were here.
19  I waited here that afternoon, I thanked them for coming and
20  they all indicated Rodney was nothing but a great father.
21  There are some issues.  You know Rodney has his own problems,
22  he understands that. But he's a strong father to his kids
23  because he's raised these kids as a single father.

24         So, he wants his child home.  He wants his child
25  with him.  He wants to participate in the services with his

10

1   child. But not have the Department breathing down his neck to
2   have him do things he's already done.  And then use his
3   poverty against him, saying well, you're too broke to do
4   this, so you can't do this.

5   So, I mean, that's what baffles me with this case.
6   This case is between is -- is reunification and building a
7   relationship between Crystle and the father and that's what
8   the focus is. This is not a focus in fixing Rodney Davis.
9   Along the way, Rodney Davis's relationship with his daughter
10   get's fixed.  But it's not, let's fix Rodney Davis and that's
11   gonna fix this problem.  That's not gonna happen. Because I
12   know Mr. Davis is not going to do that. He's gonna argue and
13   fight with the Department all along.  Because the goal for
14   the Department is to just save Mr. Davis, not work on the
15   relationship that Mr. Davis and Crystle need to work on.
16   That's where the focus needs to be.

17   I was just told by my client, he got some
18   notification about prescription meds that -- that Crystle was
19   on but nobody gave him the notification. He found that out
20   through his Medicaid, through his insurance from the
21   pharmacy.  So, again, if this is reunification, I don't if
22   this child is on medication or not, but he needs to know what
23   that medication is.

24   Again, I get these reports from the supervisor.  I
25   have no idea who it is. I don't have a name.  I get them a

11

*Josette Given*
*Certified Electronic Recorder*
*55ᵗʰ Judicial Circuit Court - Family Division*
*17ᵗʰ Judicial District Probate Court*
*Harrison, Michigan*

day before the hearing.  I don't have it signed and then when I look at these -- these -- these supervisor's report, they are -- I wish the supervisor would be here, so she could be cross-examined because now these are not subjected to cross-examination.  They're one sided.  Rodney said this. Rodney said this. Why don't you put what Crystle responded? What Crystle said.  You know, it just is a one-time thing but Rodney and Crystle arguing about -- about a friend, okay.

Again, Rodney is trying to discuss with his child about parenting.  Now, they might be a different way to do it, but that's what the focus needs to be.  So, I don't agree with this parent-agency treatment plan.  What I would suggest is that the two psychologists get together and figure out how these two individuals can be in the same room and work on a relationship. This is what this child is used to for thirteen years.  Mr. Davis, I'm assuming he's in his fifties, or more, I don't know. But he is being the same way.  It's not going to change. What's going to change is how they deal with the situation they're in.  That's where the focus is. Asking somebody to change, I've been listening, Misty has no problem with her father.  She's sitting outside.  She doesn't want to be here in court today because she's afraid that the Department's gonna take her away now.  She's sitting right outside, and I spoke to her. But her understanding of why Crystle does not want to come home is because Misty's home,

ORDER BY THE COURT

12

1   the two kids fight, if Misty was to leave, Crystle would be

2   fine coming home.

3   So, again, I don't know where this is, but I have

4   one child that reports completely different behaviors with

5   her father and completely different behavior about her

6   sibling. And then I get these reports and it's completely

7   different. So, and then I get this parent-agency treatment

8   plan that is nothing to do with the admissions that are made.

9   They are not a mirror image. They should be a mirror image

10  of what these admissions are. They are not. So, that's all I

11  have for the court, Judge.

12  THE COURT: All right. Thank you. So, turning

13  first to, what I don't want to have become a red herring,

14  which easily could. I don't know who this supervisor is, but

15  I hope that the Department is flabbergasted by these reports.

16  I hope the Department has read these reports and thought, who

17  have we hired to supervise this. This is horrible. It is

18  bizarre. And so, only the parents are to have contact with

19  Crystle. Only the parents. Nobody else. And this, I would

20  strongly suggest to the Department that they get somebody

21  else to supervise this. These phone calls are strange.

22  They're strange between the father and the daughter in a

23  contentious way. They've grown up — or these girls have

24  grown up, Crystle specifically fighting with dad and dad

25  fights with everybody. So, I kind of get dad and Crystle's

13

1  phone calls.  But these interactions with mom and the

2  boyfriend are weird.   And so those have got to stop.  Those

3  are just strange.  And I think the Department has placed

4  Crystle in a very tenuous and dangerous position.  Reading --

5  just reading these lead to that conclusion.  So, I hope the

6  Department has some sense of what I'm saying.

7       As for the parent-agency treatment plan.  At

8  disposition, the court can take into consideration,

9  everything.  Not just admissions, but everything.  Hearsay

10 and everything.  So, Mr. Davis, your behavior in the

11 courtroom can be observed by me as well.  So, as far as the

12 parent-agency treatment plan, I'm gonna order this --

13       MR. GURUMURTHY:  And Judge, just for the record,

14 he's already done a psychological.  So, we were --

15       THE COURT:  I know.  It was a psychological --

16       MR. DAVIS:  I want to say something.

17       THE COURT:  No.  You don't get to say anything

18 right now sir.  The psychological that was done by his hired

19 professional without any recommendations.  So, I am going to

20 order the psychological evaluation with Doctor Barnes.  So, I

21 have consistency amongst all of the families with

22 psychological's.  So, I can have recommendations as well.

23 Parenting time will continue to be ordered at the discretion

24 at DHHS and whether it's supervised or unsupervised.  And Mr.

25 Davis will sign all releases so that documentation can be

14

*WHAT THE HELL IS THIS*

provided. I'm not gonna order the health screen at this time. I am going to order the parenting education class. And I'm not going to order mental health pending Doctor Barnes' report because I have Doctor Ronan's report. So, I need to balance those out.

So, we'll continue to look at the parent-agency treatment plan. But this is a reunification case. We are dealing with a teenager who is familiar, obviously, with her father. He's been the primary caregiver. And so, the dam's gonna have to break here. And there's gonna have to be some contact between the father and the daughter. And most likely through some type of therapy session to start with so that they can both be somewhat contained. But hopefully Doctor Barnes gives us some better insight as well as to Mr. Davis and then we can use that along with the psychological of Crystle to get this moving. But this case needs to pick up some steam and start moving forward faster.

But Mr. Davis, a lot of that depends on you as well. So, you have the capacity to make this go a little more quickly through your willingness to participate in services that have been ordered. So, I'm gonna ask that Doctor Barnes provide the court and DHHS information within the next 60 days. We need the psychological done and some recommendations done because this is just stalling out. And I know that it'll become longer and longer if we leave it

*STOP THE LIES*

15

1    open ended.  So, I'm gonna say 60 days for that psychological

2    and all recommendations to be provided.  As well as that

3    interaction between other therapists and Doctor Barnes so

4    that we can make some headway.  Anything further Ms. Schwarz?

5          MS. SCHWARZ:  No, thank you.

6          THE COURT: And Ms. Howe?

7          MS. HOWE:  No, your Honor.

8          THE COURT:  And Mr. Gurumurthy?

9          MR. GURUMURTHY:  Yes, your Honor.  We would simply

10   again, but I would renew my previous motion.  Then we should

11   have a independent evaluation of Crystle.  You know, Doctor

12   Barnes is hired by the Department.  And I don't know if that

13   has any weight or not.  But my suggestion is, both -- if --

14   if -- if Mr. Davis has to get a second psychological, let's

15   go find a different person and let's have the two of them at

16   a different psychologist and get that done through a

17   different psychologist.

18         THE COURT:  I'm not gonna order it.  You have no

19   idea sir the trauma that you are willing to put your child

20   through.  And I'm not gonna be part of it.  So, I'm not gonna

21   order another psychological evaluation.  We are causing

22   trauma to this kid more so than is necessary.  So, we need to

23   stop that and I'm gonna stop that by not continuing to order

24   it into services and therapy and psychologist.  Enough's

25   enough.  We have an initial parent-agency treatment plan.

16

Josette Given
Certified Electronic Recorder
55th Judicial Circuit Court - Family Division
17th Judicial District Probate Court
Harrison, Michigan

11/17/2017  18:34    4682479                BARNES

 

**Byron D. Barnes, Ph.D.**
1204 W. Division
Cadillac, MI 49601
(231) 429-3757

November 14th, 2017

# PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| **Patient's Name:** | **Crystle Davis** |
| **Date of Birth:** | **January 22nd, 2004** |
| **Dates of Evaluation:** | **October 31st, 2017** |
| **Age:** | **13** |
| **Referral Source:** | **Michigan Department of Health and Human Services** |

**REASON FOR REFERRAL:** An evaluation was requested to provide information that would be useful in the diagnosis, treatment, and placement of Crystle, if needed.

**CHIEF COMPLAINT:** Crystle Davis is a 13 year-old adolescent female who reports that there is current CPS involvement. She notes that she is being evaluated because "they might think I'm crazy. CPS became involved about two weeks ago. My sister went to the hospital because she was having seizures. He (father) wouldn't say they could treat her. He don't like hospitals. My daddy is usually abusive to me: yells, screams, and calls me every word in the book – slut, bitch, whore, no good, and worthless. He repeats it over and over, daily. I'm afraid of my father when he is angry. He's like a toddler, running and screaming, and throwing a temper tantrum basically. One time he pushed me down and I fell. One time he drug me out to the car by my hair and had me sit there for a while. He hit me with a fly swatter five times on my back. He left bruises with the fly swatter. There was a big welt on my head from the hair-pulling. The physical abuse occurs about once a month. Sometimes he punches me on the arm. I put my hands up over my head." Crystle reports the presence of intrusive recollections. She reports the presence of triggers. She reports an increase in heart rate when frightened. Crystle also reports an increase in autonomic arousal secondary to triggers. She adds that she hyperventilates. Crystle notes that she is fearful, anxious, and concerned about safety. She notes that her father has been verbally abusive "since I can remember. He blows up daily."

Crystle denies a history of sexual abuse as a child. She denies that she has been touched inappropriately.

Crystle does report a history of physical abuse, as noted. She states, "He broke my mirror. It was huge. It was one time. He broke a coffee table. He slammed something down on it. He ripped off my door and my sister's door. He throws things. He hits things. He punches holes in the hallway. Maybe five times he's punched holes. He is unstable and angry." Crystle reports posttraumatic stress symptoms secondary to the physical abuse. Crystle notes that she is distressed about the circumstances within her home. She explains that she has no wish to return home. She adds that she does not want to ever return home.



PETITIONER'S
EXHIBIT

11/17/2017  10:34    4682479

BARNES

    

**Child Behavior Checklist: Respondent-Foster Mother:**
Elevations at the 95th Percentile     Elevations at the 98th Percentile
None                                 None

**INTERPRETATION OF TEST RESULTS:** Intellectually, Crystle is functioning on the very upper end of the Average Range. She is a bright individual with good intellectual capacity. She possesses the necessary intellectual ability to make use of clinical services and to be a reliable informant.

Academically, Crystle is functioning within the Average Range in basic skills. Both her reading and math scores fall within the Average Range. She is reading at a 7.5 grade level and completing math at a 6.9 grade level. There are no apparent indications of learning disabilities in reading or math.

Crystle achieved a standard score of 101 on the Developmental Test of Visual-Motor Integration. This score falls within the Average Range and reflects intact visual-motor integration skills. There are no apparent indications of gross neuropsychological deficits or severe organic impairment.

Emotionally, according to the Child Behavior Checklist that was completed by Crystle's foster mother, suggests that she perceives that Crystle is making a stable adjustment. There were no clinical elevations on this measure at either the 95th or 98th percentiles.

Emotionally, Crystle appears to be moderately distressed. The data is very consistent with the history provided. There are clear indications of anxiety and depression, likely in response to emotional trauma within the home environment. Crystle notes on the House-Tree-Person that the human figure is a super hero with big arms. Such responses are characteristic of individuals who have been exposed to trauma and wish to protect themselves. Crystle also notes that a bad guy has hurt the human figure. Her drawing of a tree depicts a Willow tree, an indication of dysphoria. Crystle notes that the tree has been hurt. Part of the tree is dead. Termites ate the tree. Crystle depicts the presence of windy weather in her drawings, an indication of stress. Crystle notes on the House-Tree-Person that she would like to live with a friend in the house that she drew, not her family. Likewise, her drawing of a house depicts a door without a doorknob, suggesting limited access. On the Incomplete Sentences she states, "What I want more than anything is…for my life to change," "My daddy is…a jerk," "I sure wish my father would…change completely," "I like my father but…he's verbally abusive," and "My family treats me like…crap." One of her three wishes is to choose her life. TAT stories also depict themes of distress. One story describes a main character named Henry. He went to a yard sale. He purchased a violin. It is a little broken. He painted it. Now he feels confused because he does not know how to play the violin. He does not know how. He gives the violin away. Another story describes a girl named Anna. She lives in the 1700s. She wanted to learn. They want her to be a farmer. They do not agree. She decides to leave and have a better life. The mother is disappointed. The brother is sad. The main character is sad. Another story describes a main character that went to jail. It is an insane asylum. She is concerned. She is so depressed that she is crippled by her

11/17/2017  10:34   4682479   BARNES     

Crystle notes that she feels sad and depressed due to the problems at home (tearful). She denies a history of suicidal ideation, suicidal gestures, and self-abusive behavior. Crystle denies that she feels hopeless and helpless. She reports low self-esteem but denies that she feels useless or worthless. She reports occasional guilt. She also reports an occasional sense of impending doom. Crystle notes that she is having crying spells once a month. Crystle notes that her appetite is good. Her sleep is good. She adds that her energy is good. Crystle notes that her memory is great. She has occasional difficulty concentrating and is occasionally distracted.

Crystle denies a history of behavioral difficulties. She notes that she is occasionally late to class. Otherwise, she denies a history of acting out. She denies a history of physical fighting, vandalism, destruction of property, playing with matches, setting fires, and teasing/cruelty to animals. She also denies a history of stealing, gang involvement, running away from home, sneaking out at night, and school truancy.

Crystle denies a history of alcohol use. She categorically denies a history of all alcohol experimentation and use.

Crystle denies a history of drug use. She categorically denies a history of all drug experimentation and use.

Crystle's foster mother notes that Crystle was placed with them on Wednesday, October 25th. She notes that Crystle is making a stable adjustment. She notes that Crystle likes to spend time with her friends. She also would like to visit Ruth, an adult friend. There are no reported indications of suicidal ideation, suicidal gestures, or self-abusive behavior. Crystle's foster mother notes that her appetite is good. She is uncertain regarding her Crystle's patterns. She denies having any specific issues or concerns about Crystle. She notes that she is well behaved and has been compliant since placed with them.

**DEVELOPMENTAL/PERSONAL HISTORY:** Crystle notes, to the best of her knowledge, that her mother did not experience any significant complications with her during the pregnancy or at the time of delivery. Her mother reportedly smoked cigarettes during the pregnancy. Crystle is reported to have progressed through the developmental milestones within normal limits. There is no reported history of enuresis or encopresis.

Crystle previously had been living with her father, Rodney Davis, age 63. Her sister, Misty Davis, age 17, is now living with her boyfriend. She reportedly experienced the same kinds of events while living with their father. Crystle's father reportedly is disabled. Crystle notes that he has been disabled for a long time. She notes that she cannot remember him working. Crystle notes that she is in the 8th grade. She is in regular education classes. She takes 9th grade health.

11/17/2017   10:34   4682479                    BARNES                              PAGE   07/10

 

**MEDICAL HISTORY:** Crystle reportedly fractured her left femur in the 3rd grade. She has no other history of serious injuries, loss of consciousness, or seizures. She had surgery on her leg. She has no other history of surgery. Crystle has no history of serious illnesses. She was hospitalized for a week with the leg injury. She denies a history of other overnight hospitalizations.

Crystle denies a previous history of psychiatric evaluation and treatment. She is not participating in counseling. She believes that there is an undiagnosed family history of psychiatric difficulties, specifically with her father. She notes that there is a family history of alcoholism.

**TESTS ADMINISTERED:** Wechsler Abbreviated Scale of Intelligence – 2nd Edition, Wide Range Achievement Test – 4th Revision, Developmental Test of Visual-Motor Integration – 6th Revision, Child Behavior Checklist: Respondent-Foster Mother, Thematic Apperception Test. Incomplete Sentences, House-Tree-Person with Protocol, and Kinetic Family Drawing. Additionally, Crystle was interviewed; her foster mother was interviewed, and available records were reviewed.

**TESTS OBSERVATIONS:** Crystle presented for testing neatly groomed and attired. She is of average height and build. The nature and purpose of the psychological evaluation was discussed, the inherent limitations to confidentiality were reviewed, issues pertaining to evaluating multiple parties were discussed, and Crystle's conservator provided written consent for her to participate in the evaluation. She was cooperative, compliant, and readily engaged throughout the assessment process. She appeared to work diligently on the administered tests, and the results are therefore believed to be a valid indicator of her current functioning.

**TEST RESULTS:**

**WASI-II Results:**

| Verbal Tests | T Scores | Performance Tests | T Scores |
|---|---|---|---|
| Vocabulary | 63 | Matrix | 47 |

Full Scale IQ    109

**Wide Range Achievement Test – 4th Revision:**

| Academic Area | Standard Score | Grade Score |
|---|---|---|
| Reading | 100 | 7.5 |
| Math | 97 | 6.9 |

**Developmental Test of Visual-Motor Integration:**

| Standard Score | Percentile |
|---|---|
| 101 | 53rd |

11/17/2017 10:34 4682479 BARNES PAGE 03/--




depression. She cannot get up. She fell to the side and she is just lying there. She is depressed. Another story describes this man who just killed his wife. He is feeling bad. He is walking away. He murdered her. He feels guilty. He gets caught. She is dead. Another story describes the main character who is looking out a window. He decides that the only way to get out of these issues is to leave. He is wondering what will happen to him. He feels longing and sadness. He leaves and has a successful life. Crystle is distressed. She has been exposed to verbal abuse. The emotional abuse has created emotional injury. There are clear indications of depression and posttraumatic stress.

Crystle's reality testing appears to be intact. There are no apparent indications of a formal thought disorder or other specific psychotic processes.

CONCLUSIONS: Crystle Davis is a 13 year-old adolescent female whose intellectual functioning falls within the Average Range. She possesses good intellectual capacity. She possesses the necessary intellectual ability to make use of clinical services. Crystle's academic achievement in basic skills falls within the Average Range. Both her reading and math scores fall within the Average Range. There are no apparent indications of learning disabilities in reading or math. Crystle's visual-motor integration capacities appear to be intact. There are no apparent indications of gross neuropsychological deficits or severe organic impairment. Her reality testing also appears to be intact. There are no apparent indications of a formal thought disorder or other specific psychotic processes.

Emotionally, Crystle appears to be moderately distressed. The data suggests that she is anxious and depressed. She is worried about her safety. She is concerned about the ongoing problems that have occurred within her home. She shows clear indications of posttraumatic stress and recurrent depression secondary to emotional within the home environment. There are clear indications of emotional injury in the data. Crystle is having a difficult time. She appears to be an appropriate adolescent. She finds the circumstances in her home with her father to be disconcerting, hurtful, and harmful.

DIAGNOSTIC IMPRESSIONS:

Axis I:      Post Traumatic Stress Disorder
             Depression, NOS
             Emotional Abuse of a Child

Axis II:     No diagnosis



## RECOMMENDATIONS:

1.  Continued placement is indicated.
2.  Individual therapy services are recommended.  Crystle needs an opportunity to process and work through the trauma to which she has been exposed.
3.  The appropriateness of visitation with her father is deferred to her individual therapist.
4.  The need for psychotropic medication also is deferred to her individual therapist.

Thank you for the opportunity to have participated in this individual's evaluation.

Sincerely,

Byron D. Barnes, Ph.D.
Licensed Psychologist

COPY X (4)

Well alot has happened First OFF I didnt end up going to Ohio instead im being home schooled in Cadalac yeah!

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

& there is NO cool People I am going to a festavil tommorow w/ Floyde (1) I cant wait he's my Best friend (1) & maybe he feels something More but I kinda do but I cant cause he's to good of a freind but you never know so wait until tommorow!

Well Floyde came & me in him had a romtic time on the fair/pettie zoo he bought me a pumpkin & I named it Flower cess mk Lowd & then we went to dinner & hug out at his place after & When my dad was talking we took a walk this week & then he Lowd☺ & kiss me My Lowd & our first kiss 🙂 At dat pht when I felt college boy & hug his arm close

CUPY (OCT 18) EFS AT RUTH HOUSE
X 4                                SAME DAY

5) Mic & Jaclen are fashion designs
   No Sorcen   HOW DID THIS HAPPEN

6) Ruth has been filing out Emergency
   Foster Care puppers so I can live w/
   her

7) Im gonna win this Custom Contest
   CHURCH HOLLWEEN PARTY

8) I got insurgent ⌣ cant wait
   to read it   SOME STORY

9) After hanging w/ruth I figured out
   I miss Judges her If your reading
   this Im so sorry your the best brother
   Ill ever have & I hope you dont doubt that
   ever

10) I have to go to a support gr
    w/ter I have mixed feelings a
    bout

11) My Sisters coming back years! (that
    was definally Sarcasm)!

    BEEN BACK!

Now thanks to the l,l bitch I am

1) leaving all MY freinds

2) leaving the State

3) leaving behind Liam, Cameron, Junden, Kaleb, Other Cam
My Sisten, My teachers, & everyone iv ever Known

I'm moving in with mary lynn who BTw
in Ohio & my going away party's te

OK

SAT going's AWAY PARTY

CRYSTLE WENT TO BUCK HORN WITH

MELISSA
ALEXAS CALL MOM TO PIC UP SCND OF F

LAWREN MAD — NO FIRE 102° no 6s.
JENIFER
MOM PU LAR CALL HER A LITTLE BITCH

I woke up got ready witch includes

1) Brushed Ma (witch means me) teeth

2) Brushed moi hair

3) Straighten moi hair

4) Put eyeliner & Mascara on

then after that I got dressed
looked stunning & got in the car & we
drove the long way then a idea POPPED
in my head & I asked my
father if we could pick up

Bree he said ok. so we drove their
& picked her up the went to a Festval
& it was AWSOME I saw a puppet Band &
went on a AWSOME hay ride & spent
the whole day being a Kid again
we went to a park & played & ate
a BUNCH of candy & then we ate
dinner & I had to let my Bestie in
the whole ride home & then came
home & had all of my myself pictits
were I put in a ??? & ??? cause but
I knew it's of me with my ??? so yeah
& now I picked for the 3 day vace
in Cucubar w/Ath so imo go to bed
& tomorrow it will probly be at church

ORDER AFTER PRELIMINARY HEARING (CHILD PROTECTIVE PROCEEDINGS) (9/16) Page 5

ORDER ___ OF ___

Case No. 17000069-NA

THE COURT ORDERS THE PETITIONER/DHHS TO PROVIDE NOTICE OF EACH HEARING PURSUANT TO MCR 3.921 TO THE FOLLOWING PERSONS: THE FOSTER PARENTS, PRE-ADOPTIVE PARENTS, AND RELATIVE CAREGIVERS OF A CHILD IN FOSTER CARE UNDER THE RESPONSIBILITY OF THE STATE, AND FOR ANY INDIAN CHILD, THE CHILD'S TRIBE AND, IF THE TRIBE IS UNKNOWN, THE SECRETARY OF THE INTERIOR, AND THE CHILD'S PARENTS OR INDIAN CUSTODY, AND IF UNKNOWN, THE SECRETARY OF THE INTERIOR.

PLACEMENT AT DHHS DISCRETION.  FATHER MAY HAVE WRITTEN OR TELEPHONE COMMUNICATION WITH CHILD AT DHHS DISCRETION.

FATHER NOT TO DISCUSS CASE WITH MOTHER AT MOTHER'S REQUEST.

HUSBAND        WIFE WIFE LAWYER

Recommended by: _____
                Referee Signature                    Date

12/15/17

Date                    JUDGE MARCY A. KLAUS          59564
                                                     Bar No.

02/27/2018 12:35 4592479 BARNES PAGE 03/18

3/18

# EXAMINATION AUTHORIZATION/INVOICE FOR SERVICES

**5. STATE OF MICHIGAN DEPARTMENT OF HUMAN SERVICES LOCAL OFFICE ADDRESS**

| 1. INVOICE NUMBER |
| 2. Canceled-Void Invoice ☐ |
| 3. Missed Appt. (not paid) ☐ |
| 4. Date of Service (Authorization Date) |

**6. PROVIDER/VENDOR ADDRESS**

BYRON D. BARNES PH.D.
520 CEDAR ST.

CADILLAC MI 49601

**7. INSTRUCTIONS TO PROVIDER/VENDOR:** Notify DHS at once if patient(s) fails to appear. Missed appointments and unauthorized tests will not be covered. Retain a copy of this Invoice, with the Invoice Number in item 1, for payment reconciliation. Provider/Vendor completes item 13 for no more than 2 different services for the patient indicated. A separate Invoice must be completed if more than 2 services are needed or if services for a patient differ from those indicated in item 10. Provider/Vendor may also enter the Patient Account number in item 14 for each patient. Amounts billed for the items listed in item 10 must be the lower of either the DHS Fee Schedule Maximum, item 12 (page 2), or your usual, customary and reasonable charge for the service.

I certify the goods/services shown below were provided and that I did not and will not make any charge or accept any payment from the client or his family for the services provided on this authorization. I further certify that all services were rendered without regard to any individual or group because of race, sex, religion, age, national origin, color, marital status, political beliefs or disability. Return signed Provider/Vendor Invoice with the DHS-93, or the signed DHS-93, with your report to the address in item 5 above.

**8. PROVIDER/VENDOR TO COMPLETE**

| a. FE ID No. Do not use Provider No. | b. Soc. Sec. No. Do not use Provider No. | c. MAIN Mail Code | d. Provider/Vendor Phone Number |
|---|---|---|---|
| 5-2108 7819 | | | 231 829 3757 |

| e. Payee Name corresponding to FE ID No (if other than above) | f. Billing Address (if other than 6 above) |
|---|---|

| g. Provider/Vendor Signature | h. Date Signed |
|---|---|
| BDB | 2-25-18 |

**9. SERVICE WORKER TO COMPLETE** (Patient/Recipient information on next page)

| a. Grantee Name (Client Name if not grantee) | b. Case Number | c. County | d. District | e. Section/f. Unit | g. Worker |
|---|---|---|---|---|---|

| h. Provider/Vendor Name | i. Provider/Vendor Number (not FE ID or SSN) |
|---|---|

| j. Service Worker Name | k. Service Worker Phone Number |
|---|---|

**10. DESCRIPTION OF SERVICES AUTHORIZED**

a. Children's Foster Care (CFC), Child Protective Services (CPS), Juvenile Justice Services (JJS) and Preventive Services for Families (PSF)

☐ Medical ☐ Psychiatric
☐ Child Sexual Abuse Exam
☐ Psychological

☐ Substance Abuse Screening and Assessment
☐ JJS Blood Drawing for DNA Gene Coding
☐ CPS Second Opinion

Explain:

d. Medical Exam Report Completed from Existing Records
☐ APS ☐ CFC ☒ CPS
☐ JJS ☐ PFS

e. Other (Specify below)
☐ APS ☐ CFC ☐ CPS
☐ JJS ☐ PFS

b. ☐ APS ☐ CFC ☒ CPS ☐ JJS ☐ PSF

☐ Photostat Copies of Existing Medical Records - VENDOR SPECIFY NUMBER OF COPIES

c. Adult Protective Services:
☐ Medical ☐ Psychological ☐ Geriatric Assessment

**11. Service Worker to complete upon return from Provider/Vendor**

| a. Service Worker Approval - Requested Reports Received ☐ Yes | b. Date: |
|---|---|

| c. Service Worker Signature | d. Date | e. Supervisor Signature | f. Date |
|---|---|---|---|

Department of Human Services (DHS) will not discriminate against any individual or group because of race, sex, religion, age, national origin, color, height, weight, marital status, political beliefs or disability. If you need help with reading, writing, hearing, etc., under the Americans with Disabilities Act, you are invited to make your needs known to a DHS office in your area.

AUTHORITY: P.A. 280 of 1939, Federal CFR, and 45 CFR.
COMPLETION: Mandatory.
PENALTY: Department is unable to pay for medical services and materials.

DISTRIBUTION:
Original to Provider/Vendor
Original to Local Fiscal Office after return from Provider/Vendor
Case Record Copy

## EXAMINATION AUTHORIZATION/INVOICE FOR SERVICES

| 12. FEE SCHEDULE MAXIMUM | | | | | | 13. PROVIDER/VENDOR COMPLETE AMOUNT BILLED | |
|---|---|---|---|---|---|---|---|
| Service | Exceeds Fee | Yes | Service | Exceeds Fee | Yes | Service 1 | Service 2 |
| 1 | Schedule Maximum Of | ☒ No ☐ | 2 | Schedule Maximum Of | ☐ No ☐ | $ 500.00 | |

### 14. Patient/Recipient Information

**Patient/Recipient 1**

| a. Patient/Recipient Name | | | b. Recipient ID Number | c. Invoice Number | d. Prior Authorization Number |
|---|---|---|---|---|---|
| e. Program Pay Code: | f. Reason Code: | | g. Service Code: | h. Transaction Number: | |
| 1.    2. | 1.    2. | | 1.    2. | | |

WHY DID THE EXCEED FEE

RONAN $350

WENDY  SP SYK EVAL

Wendy does appear to possess warm, nurturing feelings for her children. On the Incomplete Sentences she states, "I want to know...my kids are better," "I regret...leaving my children," "I suffer...not having my children," "I secretly...love to be with my kids," and "My greatest worry is...my children." It seems likely that Wendy has stayed away from these circumstances due to her fear and anxiety about the children's father. She reports a history of domestic violence. Her level of cognitive functioning likely places her in a vulnerable position and increases her risk for harm.

Wendy's reality testing appears to be intact. There are no apparent indications of a formal thought disorder or other specific psychotic processes.

CONCLUSIONS: Wendy Davis is a 46 year-old woman whose intellectual functioning falls within the Mild Range of Mental Retardation. Her Verbal, Performance, and Full Scale IQs all fall within the Mild to Moderate Ranges of Mental Retardation. There are clear indications of cognitive impairment. These deficits likely contribute to her ability to provide adequate care to children over time. Wendy's academic skills fall within the Mild Range of Mental Retardation as well. Her reading and math scores fall within the Mild Range of Mental Retardation. She is reading at a 3.2 grade level and completing math at a 2.7 grade level. These findings are consistent with cognitive impairment. Wendy's visual-motor integration capacities appear to be moderately impaired, consistent with cognitive impairment. Her visual-motor integration skills are impaired. Wendy's reality testing also appears to be intact. There are no apparent indications of a formal thought disorder or other specific psychotic processes.

Emotionally, Wendy appears to be moderately distressed. The data suggests that she is anxious, fearful, and concerned about her safety. She also experiences consequential depression secondary to the posttraumatic stress. She notes that she has been diagnosed with bipolar disorder. The data appears more consistent with a major depressive response. It would be prudent to follow her over time. She has found the medication she is taking to be helpful. It would be beneficial for her to continue on those medications. It seems likely that the recent CPS involvement and requirements that she interact with the children's father has exacerbated or triggered an increase in posttraumatic stress symptoms. She reports a significant history of domestic violence while living with Rodney. She is clearly afraid of him. She is concerned about her safety. She very well may have stayed away from her children due to this fearfulness.

DIAGNOSTIC IMPRESSIONS:

Axis I:      Post Traumatic Stress Disorder – Chronic
             Major Depression – Recurrent – Moderate
             R/O Bipolar Disorder, Type II

Axis II:     Mild Mental Retardation

STATE OF MICHIGAN
COUNTY OF CLARE
55TH CIRCUIT COURT-FAMILY DIVISION

IN THE MATTER OF:
Davis, Crystal 01/22/2004

Hon. Marcy A. Klaus
17-069-NA

Eilisia Schwarz (P66350)
Clare County Chief Assistant Prosecutor
225 W. Main Street, P.O. Box 586
Harrison, MI 48625
989-539-9831

Clare County 55th Circuit Court
Family Division
225 W. Main Street PO Box 96
Harrison, Michigan 48625
989-539-7109

Karyn Tomczyk (P76403)
PO Box 362
Gladwin, Michigan 48624
989-426-8535
Attorneytomczyk@gamail.com

Annette Howe (P67491)
PO Box 3
Beaverton, Michigan 48612
989-429-7218
annettehowe@sbcglobal.net

Ravi Gurumurthy (P78368)
PO Box 1014
Cadillac, Michigan 49601
231-577-4822
ravi@michiganlawnorth.com

PROOF OF SERVICE

STATE OF MICHIGAN )
) ss
COUNTY OF CLARE )

Dusty D Merritt, being duly sworn, deposes and says that she is the secretary for Clare County Chief Assistant Prosecuting Attorney, Eilisia Schwarz, and that on or about the 6th day of March 2018, she personally served a copy of the Psychological Evaluation for Wendy and the Court Report dated 03-05-2018 by email to the above email address for the Attorney of record on this case from my email merrittd@clareco.net and personally served a copy to the 55th Circuit Court Family Division.

DATED: March 6, 2018

Dusty D. Merritt



Michelle Ambrozaitis
Clare County Prosecuting Attorney
225 W. Main, P.O. Box 586
Harrison, Michigan 48625
Telephone: (989) 539-9831

# FAMILY TEAM MEETING REPORT
## Michigan Department of Health and Human Services

**Demographics**

| Case Name: Davis, Rodney | Case ID: | Special Needs: ☐ YES ☐ No<br>Please Describe Special Needs: |
|---|---|---|
| Race/Ethnicity: Choose an item. | Native American Affiliation: ☐ Yes ☐ No<br>Tribe: | |
| Youth's Name and Child(ren)'s Person ID#: | Youth's DOB:<br><br>Is youth YAVFC? ☐ YES ☐ No | Is Youth placed in residential: ☐ YES ☐ No |
| Case Opening Date: | Initial Removal Date: | Security Needs: ☐ YES ☐ No<br>Please Describe Security Needs: |
| Initial Petition Date: | Mandatory Petition: ☐ Yes ☐ No | |
| Worker Name: | Worker Phone Number: | Worker Load Number: |

**FTM Information**

| Date/Time FTM request initiated: 11/3/17 1 PM | Date of Pre-Meeting Discussion: | Facilitated by Case Manager: ☐ YES ☐ No<br><br>If no, name of facilitator: |
|---|---|---|
| Suggested meeting date/time: | Date Meeting Scheduled: | If meeting is facilitated by someone other than the Case Manager, please document justification here: |
| Meeting Location: Choose an item.<br>Identify Other location: | Location Address: | |
| | | Signature of supervisor approving another facilitator: |
| FTM Type 1:<br>Choose an item. | FTM Type 2<br>Choose an item. | FTM Type 3<br>Choose an item. |

| Agenda Items as Identified at the Pre-Meeting Discussion: |
|---|
| Services - Psych eval, Parenting time, appropriate Conversations during visits, Strengths, Funding paper work, DHHS 120 Native Paperwork, trauma Checklist |

| Participants as identified at the Pre-Meeting Discussion: |
|---|
| |

# FAMILY TEAM MEETING REPORT
## Michigan Department of Health and Human Services

| Case Name: Davis, Rodney | Case ID: | Date & time of FTM: 11/3/17  1:30pm |
|---|---|---|

**Families / Youth Strengths:** strong pour loves his children, tight knit family, receives income hard worker

| Family / Youth Needs | Action Steps | Time Frame | Person (s) Responsible |
|---|---|---|---|
| | (1) DHHS will speak with Rodney the court ___ ___ to determine where Rodney needs ___ | Today 11/3/17 | DHHS, Court |
| | (2) ___ contact will ___ about bring home | | |
| | (1) ___ next week<br>- needs to regain authority over the children | Wed 11/8 4pm | ___ Family |
| | - ___ ___ or transportation assistance to visit | Jerome will contact Rodney Mon 11/6/17 | |
| | - ___ from ___ ___ will call Monday to confirm visit | | |
| Services | - Psych eval to determine needs<br>- Rodney will get a Psych eval | | Rodney, Dept. |
| | + he can go w/ his own choice, but at his own cost. The Dept. will pay if Rodney agrees to use Dr. Barnes for the evaluation | | |



**McLaren**

**CENTRAL MICHIGAN**

**WEIDMAN CLINIC**

3520 North Woodruff Road
P.O. Box 36
Weidman, Michigan
48893

tel (989) 644 3329
fax (989) 644 3724

**mclaren.org**

June 15, 2018

To Whom It May Concern:

Rodney Davis is under my primary care. He continues to have problems with
uncontrolled hypertension. He does not believe his blood pressure will improve until the
court case is resolved. In my opinion, any stressful situation has the potential to
adversely affect his blood pressure.

Sincerely,

Jean Beatty, PA-C

RESPONDENT'S
EXHIBIT

RFX3
2/4/19    5P



## McLaren Central - Weidman Clinic
### 3520 N Woodruff, PO Box 36
### Weidman, MI 48893
### (989) 644-3329

**RODNEY DAVIS**
**9852 CADILLAC DR**
**LAKE, MI 48632**

**PH:** (989) 339-6488
**MRN:** 920981
**DOB:** 01/15/1954

**DOS:** Jun 6 2018 8:00AM

### Chief Complaint
Pt was late for his appt today, he asked that I check his BP I did so It was 200/110 on the left arm and 198/120 Rt arm, Spoke wirh Jean Beatty PAC. She stated he needs to increase his Atenolol to 50 mg daily and she sent in another RX of lisinopril. Instructed him he must take his meds and reschedule another appt to see Jean Beatty to address his Blood pressure issues. K K.

### Active Problems
1. Head lice (132.0) (B85.0)
   - Assessed By: Jennings, Martin (Family Medicine); Last Assessed: 29 Jul 2016
2. Hypertension (401.9) (I10)
   - Assessed By: Beatty, Jean (Family Medicine); Last Assessed: 01 May 2018
3. Seasonal allergic rhinitis, unspecified trigger (477.9) (J30.2)
4. Social problem (V62.9) (Z65.9)
   - Assessed By: Beatty, Jean (Family Medicine); Last Assessed: 03 May 2018

### Allergies
1. No Known Drug Allergies

### End of Encounter Meds

| Medication Name | Instruction |
|---|---|
| Atenolol 25 MG Oral Tablet ↑ to 2 pills | TAKE 1 TABLET DAILY. |
| RA Loratadine 10 MG Oral Tablet daily | TAKE 1 TABLET DAILY. |

### Signatures
Electronically signed by : Kolette Korman, MA; Jun 6 2018 9:14AM EST (Author)

RODNEY E. DAVIS
920981

Oct 3 2017

To whom it may concern

I Rod Davis permission for my daughter Chrystal to home school to at Ruth Nardman house at 1404 Jefferson Drive Cadillac MI 49601

Signed [signature] 10/3/17

**Ronan Psychological Associates**
201 S. University Avenue
Mount Pleasant, MI 48858
Phone: 989.779.8999 • Fax: 989.779.2219
www.ronanpsych.com

R. Davis 1

**Client's Name:** Rodney Davis
**Date of Birth:** 01.15.54
**Date of Assessment:** 01.16.18 & 01.18.18
**Date of Report:** 01.31.18

## PSYCHOLOGICAL EVALUATION

## HISTORY OF ILLNESS
### Complaints and Symptoms
Mr. Davis is a 64-year-old male who drove to the evaluation today. When asked the reason for the evaluation today he stated, "To show that I am able to care for children that I have been caring for, for the past eighteen years. CPS gave me a choice to either go to theirs [for an evaluation] and they would pay for it. But if I went to anywhere else I would have to pay for it. They want to know if I have serious mental health issues. I decided to go somewhere else". He was informed that the information he provided could be used to help adjudicated the court proceedings.

### Treatment and Medications
Mr. Davis denied a history of medical hospitalization. He denied a history of outpatient surgery. He denied a history of psychiatric hospitalizations. He denied a history of receiving outpatient mental health services, but reported having undergone two prior psychological evaluations to determine his ability to function as a parent. He denied a history of substance abuse. His last physical examination was in 2016. Current health related concerns were reported as ankle pain, chronic ear infections, high blood pressure, hip pain, knee pain, multiple sclerosis, shoulder pain, and a torn rotor cuff. Using a ten-point scale he rated his typical pain as a "five", with fluctuations to a "ten" whenever he is required to walk more than 500 feet or climb stairs. He denied using any prescription medications.

### Personal History
Mr. Davis was born in Ypsilanti and raised in Dearborn Heights, Michigan. He described his childhood as, "normal." He described his father as physically abusive, but when asked he noted that his father was never reported for physical abuse. He denied a history of alcohol abuse by his parents. He reported placement in regular education classes until he discontinued his schooling in the twelfth grade (1972). He obtained his high school diploma in 1984. He obtained a CDL license in 1977 and a heavy equipment operator license in 1997. He married in 1998, had two children (1999 – Misty Dawn Davis & 2004 – Crystle Eve Davis), and separated around 2008. He described his marriage as difficult stating, "I married a woman who had mental retardation. I didn't know that at the time, and she didn't appear to have those issues". He reported having approximately ten jobs in the past, with the longest being when he was self-employed remodeling homes (1988 to 2005). He was placed on Social Security Disability in 2007 following a job-related accident. He went on to note, "My attorney sewed the company and I got



RESPONDENT'S EXHIBIT

RJ-X4
2/1/10  S.P

an award of approximately one-hundred-and-fifty thousand dollars. He reported a past conviction for jostling (2009).

## Social Functioning

Mr. Davis lives with his eldest daughter in a home that he owns. Social Security Disability payments and benefits his daughter receives through his disability claim help to fund the home. A Bridge card helps to defray the cost of food. He described his relationship with his eldest daughter as "good". He went on to note, "She now has a boyfriend who she spends a lot of her time with. She has been dating him for a couple of years". He described his relationship with his youngest daughter by stating, "We had an outstanding relationship until she started acting out in school- she had ten write-ups in seven days. She was taken from my home on October 25th because she had so many write-ups and she was thrown off the bus so she couldn't get to school. I had planned to transition her schooling to Ohio where she would live with some friends of mine. Instead we had her home schooled with the daughter of my preacher [Ruth Nordman]. The daughter of the preacher lived in Cadillac. She (Ruth Nordman) subsequently filed papers for custody, and Crystle decided to live permanently with Ruth. I went up to get her. We left and I brought her home. She [daughter] was very upset- we had an argument. Two days later she left and went to back to live with Ruth. CPS and Ruth came to my home for a meeting. CPS wanted to take her to mental health and stated that they would pay the cost. They gave me two weeks to arrange for her treatment, but wound up taking her seven days later. She has been in foster care since that time". When asked about his relationship with his family of origin he went on to report no contact in the past five years with his one remaining sibling. He reported having approximately five close personal friends that he interacts with on a regular basis.

## Past and Present Interests

He described his current interests by stating, "Pursuing every avenue there is to get my child back". He described past interests by stating, "I use to like fishing, camping, and hiking with my children. We hunt but we just don't kill. I worked as a meteorologist for WSDS in Ypsilanti, and I really enjoyed that". He explained that he still has interests in all these activities, but that he no longer engages in them because, "They took my daughter".

## Daily Activities

When asked what he does on a typical day he replied, "I usually get up at 4:00 am. I make some coffee and turn on the radio, I usually do the dishes. Then I get the girls up for school and cook breakfast. They get on the bus between 6:15 and 6:30 am. After they get on the bus I have some coffee and relax. I listen to the radio until it gets light out. Then I go outside and work on the house. I've been working on the house quite a bit. I might go fishing with some friends or by myself". He denied engaging in any additional morning activities. He reported that he rarely has lunch. He described afternoon activities by stating, "I usually work on the house until about 2:00 pm. Then I start preparing dinner for the kids. They get home around 3:40 pm. Usually we have supper right away." He described evening activities by stating, "I usually ride my wheel chair out in the property where we have a sanctuary for wild game- particularly woodcocks. We can stay out there until dark. Then we might eat some more or sit and watch TV. They do their homework and chores, and then they shower. They usually are in bed at 10:00 pm, with electronics turned off by 11:00 pm." He reported retiring for the evening around midnight. He denied any significant sleep related concerns but went on to note "Sometimes I wake up in pain

R. Davis 3

and have to take Ibuprofen". He reported that he typically feels rested upon awakening. He reported being able to complete all household chores. He reported being able shop independently and make change.

## GENERAL OBSERVATIONS

He arrived on time for the session. His weight was reported as 280 pounds and height was reported as 72 inches. Posture and personal hygiene were unremarkable. He walked with a limp due to hip and foot pain. His interpersonal style was best described as self-focused.

### Behavior and Attitude

At the time of the evaluation he was in contact with reality. When asked how he felt about himself he replied, "In general I feel that I have many talents. I'm Native American and I try to do things related to that heritage. I try to teach my daughters Native American ways, I've raised two daughters on my own for eighteen years. I did a good job".

### Stream of Mental Activity

In general, his responses were organized and pertinent. At times he became pedantic and focused on minutia.

### Mental Trend and Thought Content

He denied any current or past auditory or visual hallucinations. He denied any obsessions, persecutions, or perceptions of possessing unusual powers. He denied any suicidal ideation. He denied any clinically significant sleep related concerns.

### Emotional Reaction

His emotional reaction can best be described as distressed. When asked how he was feeling he stated, "I feel great when I don't think about my child being detained, but when I think about my child being detained I feel terrible".

## SENSORIUM AND MENTAL CAPACITY
### Orientation

He was oriented to person, place, and time.

### Immediate Memory

He was able to recall seven digits forward and five digits backward.

### Recent Memory

He was able to recall three out three objects after a five-minute interval.

### Past Memory

He named the current president of the United States as "Trump." When asked to name the three most recent past presidents of the United States he stated, "Obama, Bush, & Clinton." He recalled his birthday.

R. Davis  4

## Information

When asked to name five large cities he responded, "New York, LA, Chicago, Huston, & Detroit". When asked to name some currently famous people he replied, "Eminem & Rosanne". When asked to name some current events he responded, "I don't watch TV; I listen to the radio. The past damage of hurricanes and 'The Wall'. Lake Michigan and Lake Huron are up about a foot. There are attacks against the president over his communications with the Russians."

## Calculation

He was able to count backward from 100 by threes. He correctly answered three out of four single digit calculations, "9+8=17, 12-7=5, 8x7=48, & 9/3=3."

## Abstract Thinking

When asked the meaning of the saying, 'the grass isn't always greener on the other side of the fence' he replied, "Things aren't always better when you change your position". When asked the meaning of the saying, 'don't cry over spilled milk' he replied, "What's lost is lost".

## Similarities and Differences

When asked how a bush and tree are alike he replied, "They both have roots and leaves, and they need sunshine". When asked how they are different he replied, "A bush tends to be a smaller plant".

## Judgment

When asked what he would do if he found a stamped, addressed envelope lying on the sidewalk he replied, "I'd probably pick it up and read it- if it was an advertisement I'd probably throw it away. If it was to a person I'd drop it in the mailbox or the post office". When asked what he would do if he discovered smoke or fire in a theatre he responded, "If it was with my family I'd tell them we need to find an exit. As we get to the exit I would scream fire". When asked about plans he noted, "I want to educate my daughter to be a marine biologist. I want to help both my daughters graduate from college. I have already deeded the property and my home to them so they will have a place to live. "

## ADDITIONAL INFORMATION

No relevant additional information was available.

## TEST RESULTS

### General Observations

He appeared motivated to complete the testing and the results are likely to reflect his current level of functioning.

### Intellectual Functioning

He was administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS) to assess his current level of cognitive functioning. The average or typical score on the composite indices is 100. He obtained the following composite scores: Verbal Comprehension = 91; Perceptual Reasoning = 105; Working Memory = 95; and Processing Speed = 92. Mr. Davis's Full Scale IQ score of 95 resulted in a percentile rank of 37. The average or typical subtest score is a 10. He obtained the following subtest scores:

R. Davis  5

| Verbal Comprehension | SCORES |
|---|---|
| Similarities | 09 |
| Vocabulary | 07 |
| Information | 09 |
| | |
| Perceptual Reasoning | |
| Block Design | 12 |
| Matrix Reasoning | 09 |
| Visual Puzzles | 11 |
| | |
| Working Memory | |
| Digit Span | 10 |
| Arithmetic | 08 |
| | |
| Processing Speed | |
| Symbol Search | 10 |
| Coding | 07 |

**Psychiatric Symptoms**
Mr. Davis completed the *Minnesota Multiphasic Personally Inventory, second edition* (MMPI). The *MMPI* is a 567-item self-report measure of psychiatric symptoms. Although this profile was within valid limits, Mr. Davis presented himself in a positive light- attempting to show that he has few psychological problems. This pattern suggests a need to project a good image, high moral values, good self-control, and freedom from psychological problems or human weakness.

**Overall Profile**
His clinical profile was within normal limits. No clinical symptoms were reported. The overall profile suggest that he has a rather limited range of interests and tends to prefer stereotyped masculine activities over literary and artistic pursuits or introspective experiences.

**Interpersonal Style**
He presented as outgoing and sociable, he reported a strong need to be around others. He is likely to be viewed by others as gregarious and enjoys attention. Personality characteristics related to social extraversion tend to be stable over time and his sociable behavior is not likely to change if he is retested at a later time. In terms of close interpersonal relationships, at times he may be viewed as intolerant and insensitive, and others may find him rather narrow-minded.

**Critical Items**
Mr. Davis endorsed several critical items that are not diagnostic, but can be useful in understanding current concerns.
- No one cares much what happens to you. (True)
- I often wonder what hidden reason another person may have for doing something nice for me. (True)
- Most people make friends because friends are likely to be useful to them. (True)
- I seldom worry about my health. (False)

R. Davis 6

**Parenting Stress**

Parenting stress was assessed using the *Parenting Stress Index* – fourth edition (*PSI*). The *PSI* is often used to evaluate the parenting system and for identifying issues that may lead to problems in the child's or parent's behavior. While his daughter is somewhat older than the standard norms, it is suggested that the results provide a reasonable approximation of the stress he experienced caring for his daughter. The PSI employs T-Scores so an average of typical score is 50. The Defensive Responding index was in an acceptable range, indicating no obvious problems with defensiveness.

| Indices | T-Scores |
|---|---|
| Child Domain | 51 |
| Parent Domain | 48 |
| Life Stress | 44 |

The Child Domain assess for child characteristics that make it difficult for parents to fulfill their parenting role. The Parent Doman assesses for parental characteristics or dysfunctions that make it difficult to maintain the parent-child system. As can be seen from the scores listed above, no significant difficulties were reported with regard to child or parent characteristic's that would make it difficult to maintain the parent-child system.

**CLINICAL IMPRESSION**

Mr. Davis was seen at this clinic on three separate occasions to complete the testing. The results of the clinical interview and mental status examination failed to identify significant abnormalities in sensorium or mental capacity. His overall mannerism was best described as somewhat anxious, but cooperative. He denied a significant history of receiving personal psychiatric services, but did report having undergone two prior psychological evaluations to assess his ability to care for his children. Copies of these reports were not available. He reported current difficulties managing chronic pain and information gleaned during the mental status examination suggests that Mr. Davis is likely to meet a DSM 5 criteria for a diagnosis of 300.82 somatic symptoms disorder with predominant pain persistent moderate.

Mr. Davis demonstrated a level of cognitive functioning that was generally in the average range, with a significant strength on tasks that assessed perceptual reasoning ability. His performance on the MMPI was within normal limits, as was the amount of parenting stress he reported. No additional psychiatric diagnoses appear warranted at this time.

**CONCLUSION**

Based upon the clinical interview, mental status examination, and intellectual evaluation Mr. Davis appears to be of average intelligence with commensurate adaptive behaviors. Deficits in his adjustment to environmental demands appear to derive from chronic pain which he has managed for many years. It may be that participating in mental health service to learn more effective strategies for managing chronic pain might prove useful.

Mr. Davis was rather defensive on the measure of psychiatric symptoms; however, such a response style is not surprising given the possible negative consequences that could derive from this evaluation. The results of the MMPI are still considered to be valid and Mr. Davis did not

R. Davis  7

report clinically significant symptoms that would warrant the diagnosis of a formal psychiatric condition. Moreover, he also did not report significant distress related to caring for his youngest daughter.

Thank you for this interesting referral. Please contact me directly if questions arise.

George F. Ronan, Ph.D., ABPP
Director & Licensed Psychologist
License # 6301007695
Expiration Date: 8.31.18

*EXIBIT* *FOR ALL*

In the matter of Crystle Davis                    File No. 17-069-NA

LGAL Court Report
for Court Hearing on August 21, 2018

1.  <u>With whom is the child currently placed?  Is this a relative?</u>
    Crystle remains placed with a licensed, non-relative foster home in Clare County. Foster mom told me
    privately that she must provide Crystle constant supervision following her release from Safe-house care.
    Foster mom states she has requested assistance from DHHS, she is exhausted.  I hope this does not
    compromise Crystle's foster placement.

    *REMOVED*

2.  Is the child current with all doctor and counselor appointments? If not, what is <u>your</u>
    recommendation?
    Yes.  *LIE*

    *NO*

3.  <u>What are the health concerns, or needs, that should be addressed?</u>
    None Noted.

4.  <u>What are the mental health needs of the child that should be addressed?</u>
    Needs are being met

5.  <u>Is the child regularly attending school and passing?  Where?  Grade level?</u>
    Crystle will be in 9th grade at Farwell High School.

6.  <u>Is parenting time established and being exercised?  How often and for what duration?</u>
    Crystle states when she was in Safe-house, her mother called her "every day."  Crystle states her mom calls
    her now about once a week.  Crystle's comments about her mom's contacts appeared more as if telling me
    this to convince herself that someone cared about her.  Crystle vacillated on whether talking to her mom
    was good or bad.  Crystle's emotional state appears compromised displaying a smiling face but
    contradictory statements.
    Crystle said her dad was "not permitted" to call her while in Safe-house.  Father is not participating in
    parenting time parameters as previously ordered.

    *LIES GUILT*  *CHECK THIS*  *DIDN'T KNOW SHE WAS THARE*  *HEART ATACT*

7.  <u>Additional information to be considered:</u>
    Crystle continues to request presence at the court hearings asserting that she is 14 years old. (Foster mom
    stated an Isabella Co. caseworker planted this idea is Crystle's head.)  I cannot support Crystle's presence
    in the courtroom at this time given her recent mental health episode(s).

    *→ LIE*

DATE:  August 21, 2018

                                        Annette K. Howe (P67491)
                                        Lawyer-Guardian Ad Litem

*IMPORTANT*  *ISABELLA CASE WORKER WHO?*

*CLARE CO. ENTERPRISE*  *SHE WANTED TO TELL THE TRUTH! NO MORE GUILT*

*CAN ONLY DO THIS*  *ROD DAVIS DEMANDED*

1    I've ordered it. And we're gonna go from there.  Court's in

2    recess.

3                      MR. GURUMURTHY:   Thank you.

4                      BAILIFF: All rise.

5                      (At 10:26 a.m., matter is adjourned.)

6

7

8    STATE OF MICHIGAN    )

9    COUNTY OF CLARE      )

10

11           I certify that this transcript consisting of 17

12   pages is a complete, true, and correct transcript to the best

13   of my ability of the dispositional hearing at the 55th Circuit

14   Court-Family Division, Clare County, on Tuesday, March 20,

15   2018.

16           This transcript is only certified if the signature

17   below is original.

18

19

20   Date:  11-11-18              _____
                                  Josette Given CER 5277
21                                55th Circuit Court-Family Division
                                  225 West Main Street
22                                P O Box 96
                                  Harrison Michigan 48625
23                                (989) 539-7109

24

25

                              17

                         *Josette Given*
                  *Certified Electronic Recorder*
           *55th Judicial Circuit Court - Family Division*
                 *17th Judicial District Probate Court*
                       *Harrison, Michigan*

guardians, or other custodians, or who is without proper custody or guardianship.

b. Respondent father's home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, non-parent adult, or other custodian, is an unfit place for the juvenile to live in.

3. MCR 2.115(B) states in relevant part "... the court may strike from a pleading redundant, immaterial, impertinent, scandalous, or indecent matter..."

4. That on or about November 8, 2017, this Court Ordered that Misty Davis be returned to the care and custody of her father, Rodney Davis.

*[handwritten: PURSRY BY J BARE   AS A   DRUGS FOSTER   NO SCHOOL WAS FORCED TO LIVE WITH ACOL HOMED   SEX ON CLAIRD B]*

5. That since the November 8, 2017 Preliminary Hearing, Misty Davis has been removed from the petition and returned to the care and custody of her father.

*[handwritten: ANOTHER WITNESS NOT SURVED   UILOW CC J BARE   BRUSE BLACK EYE]*

6. That paragraphs 9, 10, and 11 pertaining to Mistry Davis shall be struck from the pleading as they are irrelevant.

*[handwritten: BUT STILL A WITNESS ON SOPINA NOT SURVED BY RAUI OR TEN OALL]*

7. That paragraph 12 and 12 a-e [sic] is a statement that is conclusory and has no place in a fact-based petition. This allegation is vague, stale, and lacks specificity as to date, time, and location as to the current status of Respondent father's situation. In fact, DHHS's allegations in paragraph 11 date back to 2012 and 2013 and even if proven, DHHS fails to demonstrate that these actions pose a risk to the minor child in the current situation to the extent that this court take jurisdiction under MCL 712A. 2(b)(1)(2). In addition, it contains language that is hearsay. In a trial for jurisdiction, hearsay is not admissible and the wording in the Petition on its face would allow inadmissible hearsay into evidence. The allegations in this paragraph, even if proven, is insufficient for this court to take jurisdiction under MCL 712A. 2(b)(1)(2).

8. That paragraph 15 and 15 a-c [sic] is a statement that is conclusory and has no place in a fact-based petition. This allegation pursuant to MRE 403 is unfairly prejudicial that the probative value it presents. In addition, it contains language that is hearsay. In a trial for jurisdiction, hearsay is not admissible and the wording in the Petition on its face would allow inadmissible hearsay into evidence. The allegations in this paragraph, even if proven, is insufficient for this court to take jurisdiction under MCL 712A. 2(b)(1)(2). In *Haberkorn v Chrysler Corp.,* 210 Mich App 354, 533 NW2d 373 (1995) the trial court properly excluded

**GALLOWAY LEGAL SERVICES, P.L.L.C.**
**JENNIFER M. GALLOWAY**
**ATTORNEY AT LAW**
**108 S. UNIVERSITY, SUITE 5**
**MT. PLEASANT, MICHIGAN 48858**
—
**TELEPHONE (989) 953-3532**
**TELEFAX (989) 953-3534**

October 11, 2018

Rodney Davis
9852 West Cadillac Drive
Lake, MI 48632

RE: In the Matter of Crystle Davis
Clare Co. File 17-069-NA

Dear Mr. Davis,

Today we met in my office and discussed the case overall. We determined that the prosecutor has not yet filed the petition for termination of parental rights. When that is filed, the court will schedule a day for trial.   The review hearing scheduled for November 14, 2018 is a review hearing and is not the date for the trial regarding your parental rights.

Also, I ordered the transcripts from February 22, 2018 and March 20, 2018 to determine what was said on the record that led the court to take jurisdiction in this case. As we discussed today, when I receive these transcripts, I will provide you a copy.

You also talked to me about witnesses that you had prepared back in February 2018.   Please provide me a written list of the names, addresses, and telephone numbers of the witnesses you believe may be important to the facts of this case.   Also, for each witness name, please provide me a written statement of what you believe each witness would testify about.

Sincerely,

Jennifer M. Galloway

cc:   File

Case Worker: Jerome Deal

| Supervisor: | Betsy Ulicki | | 8-15-18 | | |

8/15/18

Michigan Department of Health & Human Services (MDHHS) will not discriminate against any individual or group because of race, religion, age, national origin, color, height, weight, marital status, sex, sexual orientation, gender identity or expression, political beliefs or disability. If you need help with reading, writing, hearing, etc., under the Americans with Disabilities Act, you are invited to make your needs known to an MDHHS office in your area.

THIS IS JERAME BARE
AND BIVIKA HERNANDAZ
KNEW OF PURGARY SUPERVISOR
WHO GOT JERRY UP SET
WITH ME. TRYING TO COLECT ON PROMIS OF
FUEL CARDS $60. WANTED ME ROD TO ASENTED
$30 WAS NOT AMOUNT AGRED TO BY JERAME BARE
HAD TO GET RAUI TO PICKUP IN CADILLACK SPECIALIST
NO RAUI. SAME $30 ON A DESK IN THE LOBBY
NOT RAUI OR HIS SEET ALL I ASR WAS WHARES
RAUI
THE WHOLE REASON AT HIS OFFICE I HAD A
APPOINTMENT AT 300 PM RAUI NO SHOW//

BET ULIKKI
SLAMED A BLINE DOWN
ON MY FINGETRS TO GET
PUT FEAR IN ME ON CARDS
ON ICE IN PARKING CRUCH
LOT DHS

Case # 17-069-NA

08/15/2018
PATP

Davis

Crystal Davis

|   | Name | Service | Provider | Process/Referral | Progress |
|---|------|---------|----------|------------------|----------|
| 1. | Crystle Davis | Education | Farwell Public School | Crystle will attend and complete all work assigned to complete classes. | Continued |
| 2. | Crystle Davis | Mental Health *PILLS TRY TO KILL HER BUSS* | Dr. Byron Barnes *SAID NOT A NORMALL ABUCE NEG P.T.S.D.* | Complete a full psychological evaluation. Be open and honest with Dr. Barnes during the evaluation. Follow any and all recommendations from evaluation. | Completed *PILL'S CUTTER → CHANG MED* |
| 3. | Crystle Davis | Mental Health *MOTHER BIE POLR* | CMH or other appropriate counseling service | Participate in counseling services to address trauma *BUS* | Continued |

*RONAN*

*NEVER KNEW ? ? ?*

*WENDY BI POL*
*SUESAN " "*
*MUTHER*
*CRYSTLE " "*
*SUCCIDLEX (4)*
*BRO M E DIE*
*CYS N E N DIE*
*UNCLE T CUTTER*
*ATEMP AL*
*SN*

Case # 17-069-NA                    08/15/18                         Davis
                                     PATP

| | Name | Service | Provider | Process/Referral | Progress |
|---|---|---|---|---|---|
| 1. | Rodney Davis | Mental Health *PSY ASS* | Dr. Byron Barnes *NEVER* *RONAN & ASSOIATS* | Complete a full psychological evaluation. Be open and honest with ~~Dr. Barnes~~ during the evaluation. *RONAN* If appointment needs to be rescheduled this will be done 24 hours in advance. Follow any and all recommendations from evaluation. *FIGHT* *FIGHT* | Refused *HIRED P.O. JUDGE* |
| 2. | Rodney Davis | Parenting Time *(11) X* | CMH *VISIT CRYSTLE* | Participate in all parenting times in accordance with MDHHS guidelines. *NO RELEACE TO RONAN* | Refused *LIE KNOW* |
| 3. | Rodney Davis | Documentation | MDHHS | Sign all requested releases | Refused |
| 4. | Rodney Davis | Parenting Skills | AOI or MMCCA | Participate in parenting education. Utilize skills learned from the parenting education during parenting time. | Refused *NOT* |

*LIE*
*ENTE PRISE ONE EVEN NEW TILL OVER*

*18 YRS EXP*

*JER BARE WOULD NOT ENFORCE!*
*COURT ORDER!*
*CONTEMPT*

*ROD  63 YRS OLD*
*EXP 13 YRS  CRYSTLE 13 YRS OLD*
*EXP 18 YR  MISTY 18 YRS OLD*
*HIGH SCHOOL GRAD  JOB'S 3 – 4*
*ON HER OWN  AT 19 YRS OLD*

*THIS IS WHAT THE JUDGE WANTED / MY LIFE*
*TO KEEP HER ENTERPRISE PROFIDABLE*

*100,000.00 TO DATE*

STATE OF MICHIGAN
55ᵀᴴ CIRCUIT COURT-FAMILY DIVISION FOR CLARE COUNTY

IN RE:
CRYSTLE DAVIS (DOB 1/22/2004),
                                    Minor.

HON. MARCY A. KLAUS
FILE NO. 17-069-NA

                                                        /

Eilisia G. Schwarz (P66350)
Clare County Chief Asst. Prosecuting Attorney
225 W. Main, P.O. Box 586
Harrison, Michigan 48625
(989) 539-9831
schwarze@clareco.net

Ravi Gurumurthy (P78368)
Attorney for Respondent Father
PO Box 1014
Cadillac, Michigan 49601
(231) 577-4822
Ravi@michiganlawnorth.com

Annette Howe (P67491)
LGAL for Minor, Crystle Davis
PO Box 3
Beaverton, Michigan 48612
(989) 429-7218
annettehowe@sbcglobal.net

Karyn Tomczyk (P76403)
Attorney for Respondent Mother
PO Box 362
Gladwin, Michigan 48624
(989-426-8535
attorneytomczyk@gmail.com

                                                        /

## MOTION TO ALLOW DHHS TO GIVE CONSENT FOR PSYCHOTROPIC MEDICATION

**NOW COMES**, the Department of Health and Human Services (DHHS), by and through Eilisia G. Schwarz, Clare County Chief Assistant Prosecutor, and in support of its Ex Parte Motion to Allow DHHS to Give Consent for Psychotropic Medication, state as follows:

1. Crystle Davis a minor and a temporary court ward of this court in the above captioned case.

2. On April 9, 2018, Crystle was recently seen for a sports physical because she will be throwing shot putt in track at Mid-Michigan Health in Clare, Michigan.

3. Stacy Carstensen, PA examed Crystle for the sports physical.

4. At this appointment Crystle disclosed to Stacy Carstensen that she was cutting herself and thought about suicide.

5. Carstensen prescribed Zoloft 50mg daily.

Clare County Prosecuting Attorney
225 W. Main, P.O. Box 586
Harrison, Michigan 48625
Telephone: (989) 539-9831



6. Since the filing of the Exparte motion to allow DHHS to Give Consent for Psychotropic Medication on April 20, 2018, Crystle Davis was sent home from school on April 25, 2018 due to her having suicidal issues.

7. On April 13, 2018, Carstensen followed with DHHS about the medication status, and Carstensen was insistent that Crystle commence taking the Zoloft prescription immediately.

8. This treatment requires a signature and consent of the caregiver or parent.

9. DHHS cannot consent to this treatment in place of a respondent parent unless an order is entered by the Court authorizing that authority pursuant to MCL 722.124a.

10. DHHS Foster Care Worker Jereme Bear contacted Crystle Davis' father, Rodney Davis, requesting that he review and sign the Psychotropic Medication Informed Consent Form.

11. Respondent-Father, Rodney Davis, stated that he would not meet with DHHS Jereme Bear to discuss Crystle's recent disclosures during her sports physical.

12. Respondent-Father refused to sign the paperwork necessary to begin administering the medication by Carstensen.

13. Respondent-Father told DHHS Jereme Bear to "never to come to his house again."

14. Rodney stated he has a new attorney; however, he would not give DHHS Jereme Bear the contact information for his new attorney.

15. Since speaking with him, Petitioner has not been contacted by any other attorney representing Respondent-Father.

16. Petitioner contacted Respondent-Father's current attorney of record, Ravi Gurumurthy, and Mr. Gurumurthy indicated the Respondent-Father wants a second opinion.

17. Crystle Davis needs this recommended medication and requires that there be a caregiver/parent present to sign the necessary documents and consent to necessary treatment from these treatment providers.

**WHEREFORE,** the Department of Health and Human Services respectfully requests this Honorable Court to enter the attached Order to Allow DHHS to Give Consent of Psychotropic Medication pursuant to MCL 722.124a.

evidence of police reports citing that the probative value of the reports was minimal and was substantially outweighed by the needless delay and unfair prejudice that would have occurred.

9. Paragraph 20 is simply untrue and should be struck from the petition. [Exhibit A].

WHEREFORE, Respondent Father requests that this Honorable Court to:

A. Strike paragraphs 9, 10, 11, 12, 12 a-e, 15, 15 a-c, and 20 [sic] from the Petition in whole or in part as described.

B. Amend the other paragraphs so that they are proper without the element of hearsay, conclusory statements, and allegations that are current in nature and relevant.

C. Grant any other relief which the court deems appropriate and just.

Dated: December 8, 2017

Ravi R. Gurumurthy

Respectfully Submitted,

Date:  April 27, 2018

Eilisia G. Schwarz (P66350)
Clare County Chief Assistant Prosecutor

## BRIEF IN SUPPORT

MCL 722.124a(1) provides in pertinent part:

"A probate court, a child placing agency, or the department
may consent to routine, nonsurgical medical care, or
emergency medical and surgical treatment of a minor child
placed in out-of-home care pursuant to Act No. 280 of the
Public Acts of 1939, as amended, being sections 400.1 to
400.121 of the Michigan Compiled Laws, Act No. 288 of the
Public Acts of 1939, as amended, being sections 710.21 to
712A.28 of the Michigan Compiled Laws, or this act...."

"Ordering treatment under MCL 722.124a(1) primarily depends on whether the child

has been 'placed in out-of-home care.' As a result, once a family court places a child in

foster care or other "out-of-home" living arrangement, it has statutory authority to order

medical or surgical treatment in an emergency, or routine, nonsurgical treatment even when

there is no emergency." *In re AMB*, 248 Mich App 144, 178-79; 640 NW2d 262, 282 (2001).

(Footnote omitted.)

For these reasons and those stated in the motion, Petitioner requests the court to enter

an order allowing DHS to give medical consent.

Respectfully Submitted,

Date:  April 27, 2018

Eilisia G. Schwarz (P66350)
Chief Assistance Prosecuting Attorney

STATE OF MICHIGAN
COUNTY OF CLARE
55TH CIRCUIT COURT-FAMILY DIVISION

IN THE MATTER OF:                                  Hon. Marcy A. Klaus
Davis, Crystal 01/22/2004                          17-069-NA

Eilisia Schwarz (P66350)                    Clare County 55th Circuit Court
Clare County Chief Assistant Prosecutor     Family Division
225 W. Main Street, P.O. Box 586            225 W. Main Street PO Box 96
Harrison, MI 48625                          Harrison, Michigan 48625
989-539-9831                                989-539-7109


Karyn Tomczyk (P76403)                      Annette Howe (P67491)
PO Box 362                                  PO Box 3
Gladwin, Michigan 48624                     Beaverton, Michigan 48612
989-426-8535                                989-429-7218
Attorneytomczyk@gamail.com                  annettehowe@sbcglobal.net

Ravi Gurumurthy (P78368)
PO Box 1014
Cadillac, Michigan 49601
231-577-4822
ravi@michiganlawnorth.com


## NOTICE OF HEARING

    PLEASE TAKE NOTICE the foregoing People's Motion To Allow DHHS to Give Consent for Psychotropic Medication be brought on for a hearing before the HON. Marcy A. Klaus, Circuit Court-Family Division Judge, at 225 W. Main St., City of Harrison, County of Clare, State of Michigan, on Friday, May 04 2018, at 11:30am. or as soon thereafter as counsel may be heard.

Respectfully submitted,

Dated: April 2?, 2018

EILISIA SCHWARZ    P77158
Chief Assistant Prosecuting Attorney

<div style="writing-mode: vertical-rl">Clare County Prosecuting Attorney
225 W. Main, P.O. Box 586
Harrison, Michigan 48625
Telephone: (989) 539-9831</div>



STATE OF MICHIGAN

COUNTY OF CLARE

55TH CIRCUIT COURT- FAMILY DIVISION

---

IN THE MATTER OF:

CRYSTLE DAVIS (DOB 01/22/2004)

File No. 17-0069-NA

Hon. Marcy A. Klaus

| | |
|---|---|
| Eilisia G. Schwarz (P66350)<br>Chief Assistant Prosecuting Attorney<br>225 W. Main St<br>Harrison, Michigan 48625<br>989-539-9831 | Annette Howe (P67491)<br>L-Gal For the Minors<br>PO Box 3<br>Beaverton, Michigan 48612<br>989-429-7218 |
| Karyn Tomczyk (P76403)<br>Attorney for Respondent Mother<br>PO Box 362<br>Gladwin, Michigan 48624<br>989-426-8535 | Ravi R. Gurumurthy (P78368)<br>Attorney for Respondent Father<br>PO Box 1014<br>Cadillac, Michigan 49601<br>231-577-4822 |

## PROOF OF SERVICE

I hereby certify that a copy of Respondent- Father's Response to Allow DHHS to give Consent for Psychotropic Medication was mailed by first class mail to/ emailed to/ and/or personally served upon the persons/offices listed above, at the addresses shown there on said date. I also certify that the appropriate postage was placed on said document(s) with the return address of Ravi R. Gurumurthy, PO Box 1014, Cadillac, MI 49601.

Dated: April 27, 2018

_____
Ravi R. Gurumurthy

DHHS. Respondent father also states that he has never been informed of any medical appointments for his daughter.

WHEREFORE, Respondent Father requests this Honorable Court to deny this request and hold a hearing regarding the above-request.

Dated: April 27, 2018

Ravi R. Gurumurthy
Attorney for Respondent Father

## BRIEF IN SUPPORT

MCL 722.124a (4) states that "As used in this section, 'routine, nonsurgical medical care' does not include contraceptive treatment, services, medication, or devices." In addition, MCL 722. 127 of the Child Care Organization Act protects a parent's ability to object to medical immunizations on religious grounds. It states, "nothing in the rules adopted pursuant to this act shall authorize or require medical examination, immunization, or treatment for any child whose parent objects thereto on religious grounds."

Dated: April 27, 2018

Ravi R. Gurumurthy

*received 5/30/19 smb*

# Court of Appeals, State of Michigan

## ORDER

**In re C Davis Minor**

Docket No.    **348861**

LC No.     **17-000069-NA**

---

Christopher M. Murray, Chief Judge, acting under MCR 7.203(F)(1), orders:

The claim of appeal is DISMISSED for lack of jurisdiction because it was not filed within 14 days of the April 12, 2019 order terminating parental rights. MCR 7.204(A)(1)(c). Further, appellant did not file a request for the appointment of appellate counsel with the circuit court within 14 days after the April 16, 2019 service date of the notice regarding the right to request appointed appellate counsel. MCR 3.977(J)(1)(c). Dismissal is without prejudice to the filing of an application for leave to appeal within the 63-day period provided under MCR 7.205(G)(6). See MCR 3.993(C)(2).

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

**MAY 16 2019**

Date

Chief Clerk

Copies to: Trial Court, Court Reporter(s)/
Recorder(s), Appointed Attorney, Respondent,
Petitioner, Prosecutor, Lawyer-Guardian Ad
Litem, Court of Appeals, and Indian tribe (if
applicable)

Approved, SCAO

JIS CODE: COA

| **STATE OF MICHIGAN** | **CLAIM OF APPEAL AND ORDER** | **CASE NO.** 17-069NA |
|---|---|---|
| **JUDICIAL CIRCUIT - FAMILY DIVISION**<br>CLARE **COUNTY** | **APPOINTING APPELLATE COUNSEL**<br>☐ Substitution of Counsel ☐ Order Amended | **PETITION NO.** |

**Court address**
225 WEST MAIN STREET, HARRISON MI 48625

**Court telephone no.**
989-539-7109

1. In the matter of (name(s), alias(es), DOB) Crystle Davis dob 1/22/2004

Name(s) of child(ren) affected by the order being appealed
Crystle Davis

Name and address of petitioner
Rodney Davis

Name and phone number of lawyer-guardian ad litem for child(ren)
Annette Howe 989-429-7218

2. The respondent, Rodney Davis , claims an appeal from an order terminating
Name (one respondent per claim of appeal)

parental rights entered on 4/12/2019 in the 55th Circuit Court, Family Division,
Date

Clare County, Michigan by Judge Marcy A. Klaus P59564
Bar no.

Copies of the judgment or order being appealed and the register of actions in the case are attached for the Court of Appeals,
appointed counsel, petitioner, and prosecutor.

3. On 5/01/2019 the respondent filed a request for appointment of attorney and a declaration of indigency.
Date

**IT IS ORDERED:**

4. Jennifer Galloway    108 S. University, Suite 5
Name    Address

Mt. Pleasant MI 48858    989-953-3535    P47788
City, state, and zip    Telephone no.    Bar no.

is appointed counsel for the respondent in appellate proceedings. If appointed counsel cannot or will not accept this
appointment, counsel shall notify the court immediately.

5. The court reporter(s)/recorder(s) shall file with the trial court clerk the transcripts listed below and any other transcripts
requested by counsel in this case not previously transcribed. Transcripts shall be filed within 42 days from the date ordered
or requested. MCR 7.210(B). Reporter(s)/Recorder(s) shall be compensated for the transcripts as provided by law.

| REPORTER/RECORDER NAME | NUMBER | DATE(S) OF PROCEEDING |
|---|---|---|
| Josette Given | 5277 | 10/26/2017 |
| Stacy Swan | 8859 | 11/08/17, 11/29/17,12/13/17,1/24/18,2/22/18,3/20/18,5/04/18,6/05/18,<br>8/21/18,11/14/18,1/29/19,2/01/19,2/28/19,4/10/18 |
| Haley Sulla | 9310 | 3/20/19 |
| | | |
| | | |
| | | |

The clerk shall immediately send to counsel a copy of the transcripts ordered above or requested by counsel as they
become available.

5/6/19    Marcy A. Klaus    P59564
Date    Judge    Bar no.

**Note:** This order must be served on the respondent, appointed counsel for the respondent, court reporter(s)/recorder(s),
petitioner, prosecuting attorney, Indian tribe (if any), lawyer-guardian ad litem, and guardian ad litem or attorney (if any) for the
child(ren). Service may be made by first-class mail. Use form JC 12a or JC 12b for proof of service and attach it to this order
before sending it to the Court of Appeals.

To deny appointment of appellate counsel, use form JC 85.

25 USC 1912, MCR 3.977(J)(2), (3), MCR 3.993(A)(2),
MCR 7.204, MCR 7.210(B)(3)

JC 84 (12/18) **CLAIM OF APPEAL AND ORDER APPOINTING APPELLATE COUNSEL**

Distribution of form:  Original - Court (file)
1st copy - Trial court
2nd copy - Appellee/Attorney
3rd copy - Appellant/Attorney
4th copy - Reporter/Recorder
JIS Code: RRC

Approved, SCAO

| STATE OF MICHIGAN | REPORTER/RECORDER CERTIFICATE OF ORDERING TRANSCRIPT ON APPEAL | CASE NO. |
|---|---|---|
| **JUDICIAL DISTRICT** | | 17-069-NA |
| Clare  **JUDICIAL CIRCUIT** | | |
| **COUNTY PROBATE** | Appeal to: ☑ Court of Appeals ☐ Circuit | |

**Court address**
225 West Main Street, Harrison MI 48625

**Court telephone no.**
989-539-7109

| Plaintiff's/Petitioner's name(s) and address(es)  ☐ Appellant  ☑ Appellee | | Defendant's/Respondent's name(s) and address(es)  ☑ Appellant  ☐ Appellee |
|---|---|---|
| Clare County Department of Health and Human Services
725 Richard Drive
Harrison, MI 48625 | v | Rodney Davis
9852 Cadillac Drive
Lake, MI 48632 |

| Plaintiff's attorney, bar no., address, and telephone no. | Defendant's attorney, bar no., address, and telephone no. |
|---|---|
| Kristen Brown  P47347
201 South University
Mt. Pleasant, MI 48858
989-779-3200 | Jennifer Galloway  P47788
108 South University, Suite 5
Mt. Pleasant, Michigan 48858
989-953-3532 |

☐ Probate  In the matter of _____

This certificate must be filed by the appellant or the reporter/recorder within 7 days after the transcript is ordered on appeals to the Court of Appeals. This certificate must be filed by the appellant within 7 days after the transcript is ordered on appeals to the circuit court.

I am a certified court reporter/recorder for the court designated above and I certify that:

1. On __05/06/2019__ ☐ a portion of the ☑ the complete transcript of proceedings, taken in this case
   Date

   before Hon. __Marcy A. Klaus__ __P59564__ on __10/26/17, 11/08/17, 11/29/17, 12/13/17, 01/24/18__
   Bar no.  Date(s)

   __02/22/18, 03/20/18, 05/04/18, 06/05/18, 08/21/18, 11/14/18, 01/29/19, 02/01/19, 02/28/19, 03/20/19, 04/10/19__ , was ordered by
   Date(s)

   ☐ a. _____ , attorney for _____
        Attorney name (type or print)  Name (type or print)

   ☐ b. the appellant, _____ .
        Name (type or print)

   ☐ c. the appellee, _____ .
        Name (type or print)

   ☑ d. the court.

2. Payment has been secured and the transcript will be furnished by me on or about __June 17, 2019__
   Estimated number of pages is __575__ .  Estimated date of completion

☐ 3. The transcript has been filed with the court and furnished as requested. Date filed: _____

☐ 4. There is no record to be transcribed.

__5-8-19__
Date

_Josette Given (signature)_
Reporter/Recorder signature
Josette Given
Name (type or print)

CER 5277
Certification designation and number
225 West Main Street, P O Box 96
Business address
Harrison MI 48625          9895397109
City, state, zip             Telephone no.

List names, certification designations and numbers, and dates of each proceeding of each reporter or recorder who reported or recorded or transcribed any part of the proceedings: Haley Sulla, CEO 9310 recorded the 03/20/19 hearin, Stacy Swan, CEO 8859, recorded all others except one and Josette Given, CER 5277 recorded the 10/26/17 hearing and will be transcribing all the hearings.

MCR 7.109(B)(3)(a),
MCR 7.210(B)(3)(a)

MC 501  (6/17)  **REPORTER/RECORDER CERTIFICATE OF ORDERING TRANSCRIPT ON APPEAL**

Date: 5/14/2019

IN RE C DAVIS MINOR
COA#: 348861
LC#: 17-000069-NA

The above **docket number has been
assigned** to your filing that was received
by this Court on 05/09/2019. Please use this
number on all future filings in this case.

TO:

GALLOWAY JENNIFER M
108 S UNIVERSITY AVENUE
SUITE 5
MT PLEASANT  MI  48858

STATE OF MICHIGAN
55TH CIRCUIT COURT –FAMILY DIVISION
FOR THE COUNTY OF CLARE

In the Matter of Crystle Davis, dob 1/22/2004,

File No. 17-069-NA
Hon. Marcy A. Klaus

---

## OPINION AND ORDER AFTER TERMINATION HEARING

The Termination Hearing for the Respondent father (hereafter "father"), Rodney Davis, was held on April 10, 2019. The father's paternity was established by marriage. The Respondent mother (hereafter "mother"), Wendy Davis, voluntarily released her parental rights on February 1, 2019. The Court takes judicial notice of the legal and social file for this case.

The Court received expert testimony from psychologist Dr. Byron Barnes, PhD. The Court received testimony from Sherrie LaLone, Community Mental Health (CMH) outpatient therapist, Melissa Moe, CMH clinical supervisor, Lori Tideswell, foster parent, and Jereme Bear, DHHS foster care specialist. The Court also received testimony from Cliff Towery, Sheila Hooker, Gary Zastrow, and Arma Zastrow, friends of the Respondent father, and psychologist Dr. Daniel Fachting, PhD.

The Court received into evidence one exhibit, Respondent father's Exhibit 2, the psychological evaluation of the father by Ronan Psychology Associates.

The Court determined during this case that the child was not a member of, nor eligible for membership in, a Native American Indian tribe and that the Indian Child Welfare Act did not apply to this case.

### Chronology and Facts of the Case

The child, Crystle Davis (dob 1/22/2004) was removed from the father's home on October 26, 2017. It was established that the mother had not had contact with the child in a number of years. Relative placement was explored by the Department of Health and Human Services (DHHS) without success. The child was placed in foster care by DHHS on the date of removal.

The father made admissions on February 22, 2018. The father admitted he allowed Crystle to reside in a friend's home without providing legal care and custody for her and he was unable to meet Crystle's mental health needs when she was in his care.

Disposition for the father occurred on March 20, 2018. The Parent Agency Treatment Plan ("PATP") was ordered on the day of disposition and included the following services for the father: a full psychological evaluation with Dr. Byron Barnes to address mental health needs, father to follow any recommendations as a result of the evaluation; parenting time at the discretion of DHHS; sign all releases requested by DHHS; complete a full health screen to treat any current health needs with a licensed physician; participate in parenting education; and, complete an intake with a mental health service, such as CMH or other licensed counseling service. Parenting time was initially ordered at the discretion of DHHS.

**GALLOWAY LEGAL SERVICES, P.L.L.C.**
**JENNIFER M. GALLOWAY**
**ATTORNEY AT LAW**
**108 S. UNIVERSITY, SUITE 5**
**MT. PLEASANT, MICHIGAN 48858**

**TELEPHONE (989) 953-3532**
**TELEFAX (989) 953-3534**

April 18, 2019

*I ROD WAS GIVEN CHOICE FOR LAWYER TO APP COST TO ROD BUT THEN SLANDER TO (3) LAWYERS*

Rodney Davis
9852 West Cadillac Drive
Lake, MI 48632

RE: In the Matter of Crystle Davis
Clare Co. File 17-069-NA

Dear Mr. Davis,

Enclosed are your copies of the *Opinion and Order After Termination Hearing* and the *Order Following Hearing To Terminate Parental Rights*.

Sincerely,

Jennifer M. Galloway

cc:    File

*ENTERPRISE RAUI QUIT THE*

*WOULD NOT SOP DR RONAN ? HISH 100% RANK BUT DID SOP DR FATCHING ! LOW RANK .05%*

*EVERY BIT OF THIS IS BACED ON PURGERY CONVICT MH / FALCE DIAGNOSISS BEAR NOT DR*

The Court considers that Crystle is fifteen years old and has been in foster care for almost seventeen months, since 2017. *WAY BEONP 182-365 DAYS*

The Court takes into consideration the Guardian ad Litem's reports filed with the Court and her recommendation that parental rights be terminated. *COURTS BEST INTRESS*

The Court also takes into consideration the foster mother's, Lori Tideswell, testimony. Crystle wants to be adopted for stability and safety. The foster family is willing to be considered as a possible adoptive placement.

Foster care worker Mr. Bear discussed adoption with Crystle and recommended that stability be achieved to address the severe anxiety that Crystle experiences.

The Court finds that there is clear and convincing evidence that the best interests of Crystle are to terminate her father, Rodney Davis' parental rights.

<u>Order</u>

The Court finds that the Petitioner has met the burden of proof to terminate the father's parental rights pursuant to the three statutory factors pled. The Petitioner has met the burden of proof to show that the child's best interests are served by terminating the father's parental rights. Therefore, the Court orders that the father's parental rights are terminated and there shall be no further efforts to reunify. The child is committed to DHHS and Michigan Children's Institute for the purpose of adoption. DHHS shall continue to have discretion regarding the child's placement. Relative placement shall continue to be explored by DHHS.

Date: _April 12, 2019_

_Marcy A. Klaus_
Hon. Marcy A. Klaus P59564

*JENNIFER GALLOWAY COULD NOT BE REACHED BY PHONE OR OFFICE NOT OUT OF TOWN OUT OF STATE MINN*

*CRYSTLE COMES OVER MOST EVERY DAY (OUR HOUSE) CALLS MOST EVERY DAY. AFTER MOVED FROM LORI TITWELL BEAR'S HOME PART OF THE ENTERPRISE*

in an inpatient Safe House to stabilize her. The father continued to not participate in parenting time in the therapeutic setting with CMH. Crystle's cutting behaviors continued. Crystle continued to express that she did not feel safe going home to her father and that her father was not trying to rebuild their relationship.

At the August 21, 2018 Disposition/Permanency Planning Hearing, the permanency goal was changed from reunification to termination of parental rights. This request was made by the Petitioner and supported by the Guardian ad Litem. The Court authorized the filing of the Supplemental Petition.

Parenting time was ordered to occur at the discretion of DHHS until the filing of the Supplemental Petition, at which time parenting time would be suspended.

At the same hearing, the attorney for the father motioned the Court to allow him to withdraw. The father was not maintaining contact with his attorney. The father was threatening everyone involved in the case. The Court granted the motion and appointed new counsel on the same day.

At the termination hearing, the Court learned that the father had engaged in four to five sessions of counseling with Dr. Daniel Fachting, psychologist. Those counseling sessions occurred in October 2018 and November 2018. This was a self-referral by the father. Dr. Fachting did not recall releases of information being signed by the father. Dr. Fachting testified that the father did not provide psychological evaluations of himself or Crystle for Dr. Fachting to review. The focus of the sessions was the father's depression and adjustment to having his daughter out of his care with the prospect of her return. Dr. Fachting testified that he engaged in active listening, and validation of the father during their sessions. Dr. Fachting testified that the father made progress in the form of being more relaxed and confident after their sessions, therefore further sessions would not have been helpful. Parenting skills were not addressed in depth during their sessions.

By the November 14, 2018 dispositional review hearing, neither parent was participating in parenting time. Crystle continued to received therapy from CMH therapist Sherrie LaLone. Wraparound services were utilized within the foster home. DHHS continued to try to engage the father through phone contact and at home visits. These efforts were unsuccessful. Law enforcement was requested to conduct a welfare check on the father by DHHS in October 2018. Law enforcement was unable to have contact with the father.

Despite the permanency goal change at the August 2018 Permanency Planning hearing, the Supplemental Petition was not filed by DHHS. The Court ordered that the Supplemental Petition be filed within twenty-eight days of the November 14, 2018 hearing. Parenting time continued to be offered to the parents with the requirement that the parents contact DHHS twenty-four hours before to confirm attendance. The mother had stopped attending parenting time in August 2018. The father had not participated in parenting time since the spring of 2018.

*ONLY NOT M.H.* [handwritten annotation]

DHHS reported that the father was not attending any service ordered by the Court in the PATP.

The father started to attend parenting time with Crystle at CMH on November 16, 2018. Sherrie LaLone testified that communication was the focus of the therapeutic parenting time. The father attended six of ten appointments between October 2018 to January 23, 2019. Ms. LaLone started offering therapeutic parenting time in mid-June 2018 and continued until January 23, 2019.

*BEAR STOPED THIS DEC. (20) 18 (IN VOLENTARY SURVITUDE)* [handwritten annotation]

The PATP ordered for the child included the following services: to attend the public school; complete a full psychological evaluation with Dr. Byron Barnes and follow any recommendations from the evaluation; and, participate in counseling services with CMH or other appropriate counseling service.

Dr. Byron Barnes diagnosed the child, Crystle, with Post Traumatic Stress Disorder, Depression not otherwise specified, and Emotional Abuse of a Child. Dr. Barnes concluded that the data indicated Crystle was anxious and depressed, and worried about her safety, "she finds the circumstances in her home with her father to be disconcerting, hurtful and harmful". (Dr. Barnes' Psychological Evaluation of Crystle Davis, dated November 14, 2017). Dr. Barnes recommended: continued placement [out of home], individual therapy services to address trauma, appropriateness of visitation with her father is deferred to her individual therapist, the need for psychotropic medication is deferred to her individual therapist.

The father completed a psychological evaluation with Ronan Psychological Associates. The psychological evaluation was made part of the Court's social file on February 20, 2018. The father sought and paid for this service out independently. The psychological evaluation was conducted on January 16 and 18, 2018. The evaluation concluded that the father was of average intelligence with commensurate adaptive behaviors. The report noted that the father suffered from chronic pain and recommended that "participating in mental health service to learn more effective strategies for managing chronic pain might prove useful". The father "did not report clinically significant symptoms that would warrant the diagnosis of a formal psychiatric condition", nor did he report significant distress related to caring for his daughter. The father has the capacity to participate in and understand services.

November 29, 2017, the Court ordered that the father's parenting time would be conducted through written and telephonic communication owing to the verbal and emotional abuse by the father during face to face parenting time. The father would not contact nor respond to DHHS despite repeated efforts to engage the father by the Department. February 22, 2018, the Court ordered parenting time for the father to be at the discretion of DHHS. The father continued to ignore requests of DHHS for contact regarding services and his child.

In April 2018, Crystle discussed suicidal ideation and cutting behaviors to the Physician's Assistant who was seeing her for her school sports physical. The PA prescribed Zoloft for Crystle as she continued to express suicidal thoughts. DHHS foster care specialist Bear asked the father's permission for medication to be given. The father refused to grant permission for the administration of psychotropic medication. Subsequently, DHHS was unable to reach the father by phone and could not be found at home by the foster care worker. Written communication went unanswered by the father.

*GUILT WITH OUT CONSENT*

Parenting time between the father and Crystle was not occurring. The father did not telephone, write, or visit Crystle. It was ordered at the June 5, 2018 review hearing that the father would need to contact DHHS twenty-four hours in advance of parenting time to confirm that he would be attending. Face to face parenting time was referred to CMH by DHHS so that parenting time could be facilitated by a CMH therapist. CMH outpatient therapist Sherrie LaLone began counselling Crystle in mid-June of 2018.

*DEMAND*

*NOT THERAPIST*

In August 2018, Crystle again threatened suicide and was hospitalized. The CMH Crisis Team became involved. Crystle had phoned her father and told him that she was suicidal and his response was to encourage her to do so, as long as he did not go to jail. The Crisis team was able to place Crystle

*THIS IS ANOTHER LIE*

*WANTED TO COME HOME!*

maintain contact with his daughter by offering transportation to court and service providers, therapeutic parenting time, telephone contact and written contact.

### Statutory Grounds and the Court's Findings

Under MCL 712A.19b(3)(c)(i) and (ii), failure to rectify conditions, the Court finds that more than 182 days have elapsed since the issuance of the initial disposition order on March 20, 2018. There is clear and convincing evidence that the conditions that led to adjudication, the father is emotionally abusive to the child and cannot or will not meet her mental health needs, continue to exist and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age of fifteen years old.

Other conditions exist that cause the child to come within the court's jurisdiction, the child's mental health needs are becoming more serious with threats of suicide and cutting behaviors, marked depression, anxiety, and PTSD triggered by the father. The father has received recommendations to rectify those conditions through services offered in the Parent Agency Treatment Plan including parenting time in a therapeutic setting, and the conditions have not been rectified by the father after notice and multiple hearings during the seventeen months that the child has been in care, and there is no reasonable likelihood that the conditions will be rectified within a reasonable time considering the child's age.

Under MCL 712A.19b(3)(g), there is clear and convincing evidence that the father fails to provide proper care and custody for the child and there is no reasonable expectation that the father will be able to provide proper care and custody within a reasonable time considering the child's age. The father refuses to participate in services to repair and foster a healthy parent-child relationship. The father continues to externalize blame. He has minimally participated in services without adequate benefit to safely reunify him with his daughter, Crystle.

Under MCL 712A.19b(3)(j), there is clear and convincing evidence that there is a reasonable likelihood, based on the conduct or capacity of the father, that the child will be harmed if she is returned home to her father. The father has the capacity to make changes and to benefit from services that were offered, however he chose to not engage in services, as ordered, with the exception of approximately three months of therapeutic parenting time at CMH at the end of 2018 and beginning of 2019. Those parenting times were fraught with conflict and blame by the father, anxiety and self-harm by the daughter. There was no progress made by the father to learn and benefit from the therapy offered. A return home to the father's care would result in further trauma and harm to the child.

### Best Interest Factors

Dr. Barnes diagnosed Crystle as suffering from PTSD and abuse of a child while in her father's care. Dr. Banes testified that Crystle was very clear in stating that she did not want to live with her father. This statement was made in November 2017. Crystle has clearly stated this same desire, throughout the seventeen months of proceedings, to be away from her father because of her fear of him and her anger toward him. Dr. Barnes stressed that there was a "significant disruption in the parent-child relationship" which is not common even in situations of abuse or neglect. Dr. Barnes stated that it was imperative that the father participate in therapy in order to repair their relationship. Unfortunately, this did not occur.

J BEAR   PRETENDED   DR RONAN
DID NOT EXSIST



Dear Father

I Went to lak tnho tc
Call you if you Come back
before I come back
Please dont leave
Without Me
Thnks Bye 😊

 **Community Mental Health for Central Michigan**

www.cmhcm.org

February 14, 2018

Clare County DHHS
Attn: Jereme Bear
725 Richard Dr.
Harrison, Michigan 48625

Re: Crystle Davis

DOB:  01/22/2004                    Case# 019918

Mr. Bear,

I have met with Crystle eight times since being assigned as her Outpatient Therapist on 11/15/17.  In that time we have been building rapport, identifying treatment goals and completing the UCLA PTSD Reaction Index for Children/adolescents.  Our treatment plan is focused on supporting Crystle in processing through the trauma she has endured, understanding the impact it has on her moods, emotions and behaviors and teaching her tools for regulating emotions and handling trauma reminders and triggers as they come up.

Crystle presents with symptoms of PTSD and a majority of her flashbacks, memories, cognitive distortions and upset feelings are in regards to her father as a result of the psychological abuse he has inflicted.  Crystle has shared on more than one occasion she is fearful of her father and what he might do to her.  He has reportedly made threats to her safety, even after her entering foster care.  Because she has yet to develop a full set of coping skills to handle these triggers and threats as they arise, seeing him and spending time with him would likely cause undue emotional distress at this point in time.

Katie L. Most, LMSW, QMHP, QIDP, CMHP
Outpatient Therapist


Sara Miceli-Sorensen, LMSW, QMHP, QMRP, CMHP
Clinical Supervisor



**Joint Commission**
on Accreditation of Healthcare Organizations

*Serving Clare, Gladwin, Isabella, Mecosta, Midland, and Osceola Counties*
789 North Clare Avenue • P.O. Box 817 • Harrison, Michigan 48625 • (989) 539-2141 • (989) 539-2143 FAX • (989) 773-2890 TTY